[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12862

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 30, 2010
JOHN LEY
CLERK

D. C. Docket No. 08-02910-CV-TCB-1

EARL RANDALL,

Plaintiff-Appellant,

versus

JEWEL SCOTT,
in her individual capacity,
HEADLEY LEOPOLD SCOTT,
TRACY GRAHAM LAWSON,
Clayton County District Attorney, in
her official capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 30, 2010)

Before BIRCH, BARKETT and KRAVITCH, Circuit Judges.

BIRCH, Circuit Judge:

In this 42 U.S.C. § 1983 First Amendment retaliation claim appeal, we (1) reevaluate the pleading standard requirement for § 1983 cases involving qualified immunity, (2) determine whether Earl Randall's ("Randall") complaint – alleging state conduct restricting his ability to run for public office – raises a claim for violation of his First Amendment rights, and (3) resolve whether Jewel Scott ("Scott") was entitled to qualified immunity. The district court granted Scott's motion to dismiss Randall's individual and official capacity claims against Scott. We reject the district court's application of a heightened pleading standard and the district court's determination that Randall failed to allege a First Amendment violation. We agree, however, with the district court's determination that Scott enjoys qualified immunity protection for her actions. Accordingly, we AFFIRM the district court's grant of Scott's motion to dismiss Randall's individual capacity claim, and REVERSE the district court's dismissal of Randall's official capacity claim.

## I. BACKGROUND

The district court order summarized the factual allegations stated in Randall's complaint as follows:

Randall was hired as an investigator after Jewell Scott was elected to the position of district attorney [of Clayton County, Georgia]. In June of 2005, Randall was promoted by Jewell Scott and became her chief of staff.

On or about September 21, 2007, Randall was approached by three colleagues who asked him to consider running for the position of Chairman of the Clayton County Board of Commissioners ("Chairman"). On or about September 23, 2007, Randall and his wife agreed that he should pursue the opportunity.

On September 26, 2007, Randall met with Jewel Scott and told her that he intended to run for Chairman. According to Randall, Jewel Scott initially expressed to him that she was pleased with his decision to run for the position and mentioned that she did not want her husband, Lee Scott, to run.

That same day, Randall filed a Declaration of Intent to run with the Clayton County Election Office. Within a few days of filing this declaration, Randall learned that Lee Scott was very angry about Randall's decision to run for the position. Randall alleges that Lee Scott was seen slamming his fist into the table at a restaurant and stated that he wanted Jewel Scott to use her position to force Randall out of the race.

On or about September 28, 2007, Jewel Scott advised Randall that her husband was very upset about his decision to run. She told him that Lee Scott wanted to run for Chairman and that Randall's campaign could potentially split the voters who wanted to vote against the incumbent, Eldrin Bell.

Randall refused to withdraw from the race. In October 2007, he met with Lee Scott, Jewel Scott and employees from the Clayton County District Attorney's office. Lee Scott told Randall that he wanted to run for Chairman, and Randall replied that he did not see a problem running for the same office. Lee Scott then became upset and told Randall that they would become enemies if Randall did not back out of the race, and he threatened to "destroy Randall." Randall refused to drop out of the race. Lee Scott then allegedly turned to Jewel Scott and asked her to fire Randall.

In November of 2007, Jewel Scott allegedly told Randall that Lee Scott was pressuring her to fire Randall unless he backed out of the race. She told Randall to look for another job. Randall was

approached by several mutual acquaintances who told him that Lee Scott was angry about Randall "reaching out to his political supporters" and warned him that if he stayed in the race he might lose his job because "he was making life difficult for Jewel Scott."

Jewel Scott told Randall that "Lee Scott and Sheriff Hill told her that she would be perceived as a weak leader if she did not fire Randall for expressing his political views in a race against Jewel Scott's husband, among other candidates."

On December 17, 2007, Randall sent invitations to a fundraiser hosted by one of his political supporters. Randall sent an invitation to Jewel Scott. The next day, Randall learned that Jewel Scott was upset about the fundraiser and that Lee Scott was angry because Randall was seeking campaign contributions through the fundraiser.

Five days after Jewel Scott received the invitation to Randall's fundraiser, she terminated Randall's employment.

Randall alleges that following his termination he has been unable to find permanent employment in law enforcement and has been forced to curtail his campaign activities because of his financial condition. Randall seeks lost wages, compensatory damages and punitive damages.

R1-18 at 2-5.

On 28 April 2008, Randall filed this action in the Superior Court of Clayton County, Georgia, asserting a First Amendment retaliation claim pursuant to 42 U.S.C. § 1983 against Scott, in her individual and official capacities, and a tortious interference claim against her husband, Headley Leopold Scott. *Id.* at 1-2. On 17 September 2008, Scott removed the case to the United States District Court for the Northern District of Georgia. *Id.* at 2. On 22 September 2008, Scott filed a motion to dismiss, in which she argued that Randall's complaint failed to state a First Amendment violation and alternatively that she was immune from suit. *Id.*

4

The district court granted Scott's motion to dismiss on 20 May 2009. *Id.* at 17. The court concluded that "in light of the heightened pleading standard applicable in § 1983 cases, the mere fact that Randall decided to run for political office and held an event in connection with his candidacy is not enough to trigger First Amendment protection." *Id.* at 14. Alternatively, even if the allegations in the complaint were suffcient to establish a First Amendment violation, the court concluded that Scott was entitled to qualified immunity because she did not violate clearly established law. *Id.* at 15-16.

On appeal, Randall first argues that the district court improperly subjected his complaint to a heightened pleading standard. Randall suggests that our circuit precedent has been undermined by the Supreme Court's decisions in *Jones v. Bock*, 549 U.S. 199, 127 S. Ct. 910 (2007) and *Ashcroft v. Iqbal*, 556 U.S. __, 129 S. Ct. 1937 (2009). Second, Randall contends that the district court's First Amendment protection analysis was flawed, because his First Amendment rights were violated when Scott fired him for deciding to run for Chairman of the Clayton County Board of Commissioners. Randall further submits that Scott is not entitled to qualified immunity for violating his First Amendment rights.

## II. DISCUSSION

We review a district court order granting a motion to dismiss *de novo,*

5

applying the same standard as the district court. *Hoffman-Pugh v. Ramsey*, 312

F.3d 1222, 1225 (11th Cir. 2002). We therefore accept as true the facts as set forth

in the complaint and draw all reasonable inferences in the plaintiff's favor. *See*

*Wilson v. Strong*, 156 F.3d 1131, 1133 (11th Cir. 1998).

A. Pleading Standard

In granting Scott's motion to dismiss, the district court "employed a

heightened pleading standard." R1-18 at 6. Citing our opinion in *Danley v. Allen*,

540 F.3d 1298, 1313-14 (11th Cir. 2008), the court stated that is was "'bound to

apply the heightened pleading requirement' in a § 1983 case involving qualified

immunity." R1-18 at 6. On appeal, Randall argues that our circuit's heightened

pleading requirement for § 1983 cases involving qualified immunity has been

overruled by *Jones* and *Iqbal*.

1. *History of Heightened Pleading Requirement*

Generally, under the Federal Rules of Civil Procedue, a complaint need only

contain "a short and plain statement of the claim showing that the pleader is

entitled to relief." Fed. R. Civ. P. (8)(a)(2). To survive a 12(b)(6) motion to

dismiss, the complaint "does not need detailed factual allegations," *Bell Atlantic*

*Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007), but must

"give the defendant fair notice of what the plaintiff's claim is and the grounds upon

6

which it rests," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103 (1957).

Over two decades ago, "in an effort to eliminate nonmeritorious claims on the pleadings and to protect public officials from protracted litigation involving specious claims, we, and other courts . . . tightened the application of Rule 8 to § 1983 cases." *Arnold v. Bd. of Educ. of Escambia County*, 880 F.2d 305, 309 (11th Cir. 1989). Under this heightened pleading standard, plaintiffs were required to provide "some factual detail" in addition to plain statements showing that they were entitled to relief. *Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992). We found such additional factual detail useful in § 1983 cases in order to make qualified immunity determinations at the motion to dismiss stage and to prevent public officials from enduring unnecessary discovery.

In 1993, the Supreme Court decided *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S. Ct. 1160 (1993), a § 1983 case involving a municipal entity defendant. In *Leatherman*, the Supreme Court stated that "it is impossible to square the 'heightened pleading standard' . . . with the liberal system of 'notice pleading' set up by the Federal Rules. Rule 8(a)(2) requires that a complaint include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* at 168, 113 S. Ct. at 1163 (*citing* Fed. R. Civ. P. (8)(a)(2)).

7

Since *Leatherman*, we have yet to decide whether *Leatherman's* holding applies in cases against individual defendants. *See, e.g. GJR Investments, Inc. v. County of Escambia, Fla.,* 132 F.3d 1359, 1367-68 (11th Cir. 1998) (stating that "heightened pleading . . . is the law of this circuit" when § 1983 claims are asserted against government officials in their individual capacities.). We read *Leatherman*'s holding as limited to § 1983 actions against entities. *See Swann v. Southern Health Partners, Inc.*, 388 F.3d 834, 838 (11th Cir. 2004) ("*Leatherman* overturned our prior decisions to the extent that those cases required a heightened pleading standard in § 1983 actions against entities that cannot raise qualified immunity as a defense.").

In 1998, the Supreme Court decided *Crawford-El v. Britton*, 523 U.S. 574, 118 S. Ct. 1584 (1998), in which it addressed how a § 1983 plaintiff must allege unconstitutional motive. The Court stated:

> In the past we have consistently . . . refused to change the Federal Rules governing pleading by requiring the plaintiff to anticipate the immunity defense, or requiring pleadings of heightened specificity in cases alleging municipal liability . . . . As we have noted, the Court of Appeals adopted a heightened proof standard in large part to reduce the availability of discovery in actions that require proof of motive. To the extent that the court was concerned with this procedural issue, our cases demonstrate that questions regarding pleading, discovery, and summary judgment are most frequently and most effectively resolved either by the rulemaking process or the legislative process.

*Id.* at 595, 118 S. Ct. at 1595 (internal citations omitted). In 2002, the Supreme

8

Court decided *Swierkiewicz v. Sorema*, 534 U.S. 506, 513, 122 S. Ct. 992, 998 (2002), an employment discrimination case, and held that "complaints . . . must satisfy only the simple requirements of Rule 8(a)." The Court stated:

> Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions. Rule 9(b) for example, provides for greater particularity in all averments of fraud or mistake. This Court, however, has declined to extend such exceptions to other contexts. In *Leatherman* we stated: "The Federal Rules do address in Rule 9(b) the question of the need for greater particularity in pleading certain actions, but do not include among the enumerated actions any reference to complaints alleging municipal liability under § 1983 " . . . Just as Rule 9(b) makes no mention of municipal liability under [§ 1983] neither does it refer to employment discrimination. Thus, complaints in these cases, as in most others, must satisfy only the simple requirements of Rule 8(a).

*Id.* (footnotes omitted)

While a number of circuits relied upon the language in *Crawford-El* and *Swierkiewicz* to reject a heightened pleading standard in § 1983 individual-official cases,[1] our circuit did not. *See Swann*, 388 F.3d at 838 (reaffirming the heightened

---

[1] *See, e.g., Doe v. Cassell*, 403 F.3d 986, 988-89 (8th Cir. 2005) (holding that "[t]he only permissible heightened pleading requirements in civil suits are those contained in the Federal Rules of Civil Procedure or those in federal statutes enacted by Congress."); *Educadores Puertorriquenos en Accion et al. v. Hernandez*, 367 F.3d 61, 66 (1st Cir. 2004) ("*Swierkiewicz* has sounded the death knell for the imposition of a heightened pleading standard except in cases in which either a federal statute or specific Civil Rule requires that result."); *Alston v. Parker*, 363 F.3d 229, 233 (3rd Cir. 2004) ("[A] fact-pleading requirement for civil rights complaints has been rejected by the Supreme Court in no uncertain terms."); *Phelps v. Kapnolas*, 308 F.3d 180, 186-87 (2d Cir. 2002) (using notice pleading in a § 1983 action for violation of the Eighth Amendment); *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir. 2002) ("[N]early all of the circuits have now disapproved any heightened pleading standard in cases other than those governed by Rule 9(b)."); *Goad v. Mitchell*, 297 F.3d 497, 503) (6th Cir. 2002) ("We conclude that the Supreme Court's decision in *Crawford-El* invalidates the heightened

pleading standard in § 1983 cases that involve parties eligible for qualified

immunity after *Crawford-El* and *Swierkiewicz* ).

2. *Heightened Pleading in a Qualified Immunity Case After* Jones *and* Iqbal

We are bound by the holdings of earlier panels unless and until they are

clearly overruled by this court *en banc* or by the Supreme Court. *United States v.*

*Smith*, 122 F.3d 1355, 1359 (11th Cir. 1997) (per curiam). "While an intervening

decision of the Supreme Court can overrule the decision of a prior panel of our

court, the Supreme Court decision must be clearly on point." *Garrett v. Univ. of*

*Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1292 (11th Cir. 2003) (per curiam).

a. *Jones*

We now address for the first time the effect of *Jones* and *Iqbal* on our

precedent regarding § 1983 pleading standards for defendants who are able to

assert a qualified immunity defense.[2] In *Jones,* the Supreme Court rejected the

pleading requirement."); *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002) (holding that "there are no special pleading rules for prisoner civil rights cases"); *Currier v. Doran*, 242 F.3d 905, 916 (10th Cir. 2001) ("This court's heightened pleading requirement cannot survive *Crawford-El*.").

[2] We have already applied *Iqbal* to a § 1983 suit against defendants raising a qualified immunity defense. *Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010). In that case, we determined that plaintiffs' allegations met both the *Iqbal* pleading standard and our circuit's heightened pleading standard. *Id.* at 762-63. The opinion also, in *dicta*, equated the two standards. *Id.* at 763. We now say explicitly what *Keating* implied: whatever requirements our heightened pleading standard once imposed have since been replaced by those of the *Twombly-Iqbal* plausibility standard. As we recently emphasized in *American Dental Ass'n v. Cigna Corp.*, "The [Supreme] Court in *Iqbal* explicitly held that the *Twombly* plausibility standard

10

contention that Prison Litigation Reform Act (PLRA) plaintiffs were required to affirmatively plead exhaustion of administrative remedies. *Jones*, 549 U.S. at 216, 127 S. Ct. at 921. The Court explained that "[t]he argument that screening would be more effective if exhaustion had to be shown in the complaint proves too much; the same could be said with respect to any affirmative defense." *Id.* at 215, 127 S. Ct. at 921. The Court further stated that it had explained in *Leatherman* and *Swierkiewicz* "that courts should generally not depart from the usual practice under the Federal Rules on the basis of perceived policy concerns." *Id.* at 212, 127 S. Ct. at 919.

While the *Jones* case *dicta* does speak broadly regarding pleading standards, the holding is restricted to PLRA plaintiffs and PLRA pleadings. *Dicta* "is neither the law of the case nor binding precedent." *Great Lakes Dredge & Dock Co. v. Miller*, 957 F.2d 1575, 1578 (11th Cir. 1992). We therefore conclude that *Jones* does not overrule our precedent regarding heightened pleading requirements in § 1983 actions involving individuals able to assert qualified immunity as a defense.

applies to all civil actions. . . because it is an interpretation of Rule 8." 605 F.3d 1283, 1290 (11th Cir. 2010) (emphasis added). Thus, like complaints in all other cases, complaints in § 1983 cases must now "'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" *Bryson v. Gonzales*, 534 F.3d 1282 (10th Cir. 2008) (*quoting In re Plywood Antitrust Litigation*, 655 F.2d 627, 641 (5th Cir. Unit A 1981), *quoted with approval in*, *Twombly*, 550 U.S. at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984) (*quoting In re Plywood Antitrust Litig.*, 655 F.2d at 641))).

11

b. *Iqbal*

*Iqbal* dealt with an individual who "filed a *Bivens* action[3] in the United States District Court for the Eastern District of New York against . . . [numerous] federal officials." *Iqbal,* 556 U.S. __, 129 S. Ct. at 1943. "[T]he complaint allege[d] that [federal officials] adopted an unconstitutional policy that subjected [Mr. Iqbal] to harsh conditions of confinement on account of his race, religion, or national origin." *Id.* at __, 129 S. Ct. at 1942. In the district court, the defendant federal officials "raised the defense of qualified immunity and moved to dismiss the suit, contending the complaint was not sufficient to state a claim against them." *Id.* at __, 129 S. Ct. at 1942. On appeal, the Supreme Court addressed the issue of whether Mr. Iqbal, "as the plaintiff in the District Court, plead factual matter that, if taken as true, states a claim that petitioners deprived him of his clearly established constitutional rights." *Id.* at __, 129 S. Ct. at 1942-43.

In analyzing the sufficiency of Mr. Iqbal's complaint, the Supreme Court stated that "[u]nder Federal Rule of Civil Procedure 8(a)(2), a pleading must

[3] *See Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 389, 91 S. Ct. 1999, 2001 (1971). While *Iqbal* involved a *Bivens* action, and the case before us involves a § 1983 suit, the difference is inconsequential. Both deal with an unconstitutional deprivation of rights which the Supreme Court compares on equal footing for certain analysis. *See Iqbal,* 556 U.S. __, 129 S. Ct. at 1949; *Harlow v. Fitzgerald*, 457 U.S. 800, 809, 102 S. Ct. 2727, 2733 (1982) ("[I]t would be untenable to draw a distinction for purposes of immunity law between suits brought against state officials under [§ 1983] and suits brought directly under the Constitution against federal officials.") (quotation marks and citation omitted).

12

contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* at __, 129 S. Ct. at 1949 (*citing* Fed. R. Civ. P. 8(a)(2)). The Court, citing *Twombly,* continued: "[t]wo working principles underlie our decision . . . [f]irst, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions [and] . . . second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at __, 129 S. Ct. at 1949-50 *citing Twombly,* 550 U.S. at 555, 556, 127 S. Ct. at 1955.

The Court went on to state that Mr. Iqbal's argument that *Twombly* "should be limited to pleadings in the context of an antitrust dispute . . . is not supported by *Twombly* and is incompatible with the Federal Rules of Civil Procedure." *Iqbal,* 556 U.S. at __, 129 S. Ct. at 1953. "Rule [8] . . . governs the pleading standard 'in all civil actions and proceedings in the United States district courts." *Id.* at __, 129 S. Ct. at 1953 (*citing* Fed. R. Civ. P. 1). "Our decision in *Twombly* expounded the pleading standard for 'all civil actions.'" *Id.* at __, 129 S. Ct. at 1953.

Addressing qualified immunity and the discovery process, the Court stated:

> Respondent next implies that our construction of Rule 8 should be tempered where, as here, the Court of Appeals has "instructed the district court to cabin discovery in such a way as to preserve" petitioners' defense of qualified immunity "as much as possible in anticipation of a summary judgment motion." Iqbal Brief 27. We have held, however, that the question presented by a motion to

13

dismiss a complaint for insufficient pleadings does not turn on the controls placed upon the discovery process. *Twombly, supra,* at 559, 127 S. Ct. 1955 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side" (internal quotation marks and citation omitted)). . . . The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including "avoidance of disruptive discovery." *Siegert v. Gilley,* 500 U.S. 226, 236, 111 S. Ct. 1789 (1991) (KENNEDY, J., concurring in judgment).

> . . . .

> . . . It is no answer to these concerns to say that discovery for petitioners can be deferred while pretrial proceedings continue for other defendants. It is quite likely that, when discovery as to the other parties proceeds, it would prove necessary for petitioners and their counsel to participate in the process to ensure the case does not develop in a misleading or slanted way that causes prejudice to their position. Even if petitioners are not yet themselves subject to discovery orders, then, they would not be free from the burdens of discovery.

> We decline respondent's invitation to relax the pleading requirements on the ground that the Court of Appeals promises petitioners minimally intrusive discovery. That promise provides especially cold comfort in this pleading context, where we are impelled to give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties.

*Id.* at __, 129 S. Ct. at 1953-54. The Court concluded its analysis of Rule 8 by stating: "Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Id.* at __, 129 S. Ct. at 1954.

14

In short, while the *Iqbal* opinion concerns Rule 8(a)(2) pleading standards in general, the Court specifically describes Rule 8(a)(2) pleading standards for actions regarding an unconstitutional deprivation of rights. The defendant federal officials raised the defense of qualified immunity and moved to dismiss the suit under a 12(b)(6) motion. The Supreme Court held, citing *Twombly*, that the legal conclusions in a complaint must be supported by factual allegations, and that only a complaint which states a plausible claim for relief shall survive a motion to dismiss. The Court did not apply a heightened pleading standard.

While *Swann*, *GJR*, and *Danley* reaffirm application of a heightened pleading standard for § 1983 cases involving defendants able to assert qualified immunity, we agree with Randall that those cases were effectively overturned by the *Iqbal* court. Pleadings for § 1983 cases involving defendants who are able to assert qualified immunity as a defense shall now be held to comply with the standards described in *Iqbal*. A district court considering a motion to dismiss shall begin by identifying conclusory allegations that are not entitled to an assumption of truth – legal conclusions must be supported by factual allegations. The district court should assume, on a case-by-case basis, that well pleaded factual allegations are true, and then determine whether they plausibly give rise to an entitlement to

15

relief.[4]

Regarding the order at issue here, two days after *Iqbal* was decided, the district court granted Scott's motion to dismiss employing a "heightened pleading standard." R1-18 at 6. We conclude that the district court erred in applying a heightened pleading standard to Randall's complaint. After *Iqbal* it is clear that there is no "heightened pleading standard" as it relates to cases governed by Rule 8(a)(2), including civil rights complaints. All that remains is the Rule 9 heightened pleading standard.

B. First Amendment Violation

The district court found that Randall's actions were "not enough to trigger First Amendment protection." *Id.* at 14. While we would generally remand to the district court to reconsider its analysis of Randall's constitutional rights under the *Iqbal* pleading standard before discussing Randall's constitutional rights, in this case we must go further. The court's statements make explicit that under any pleading standard Scott's motion to dismiss would have been granted.[5]

---

[4] For a thorough discussion of *Twombly* and *Iqbal* precedent, *see American Dental Ass'n,* 605 F.3d at 1290.

[5] Rather than remanding to the district court to draw the same conclusion under a different pleading standard – regarding a First Amendment violation and qualified immunity – and requiring Randall to appeal that decision, for the purposes of judicial efficiency we will address whether the allegations of Randall's complaint could allege a violation of his First Amendment rights, and whether Scott was entitled to qualified immunity.

1. *Was Randall Entitled to First Amendment Protection?*

Precedent in the area of constitutional protection for candidacy can be best described as a legal morass. *See Cutcliffe v. Cochran*, 117 F.3d 1353, 1360 (11th Cir. 1997) (Harris, Senior U.S. District Judge sitting by designation and specially concurring) ("Is there confusion in this area of law? Members of the Supreme Court are among those who have expressed their belief that there is, and my study of the subject matter leads me to the same conclusion."). Rather than wading through the bog to determine exactly what level of scrutiny should be applied, and what constitutional protection there is, we will instead determine whether Randall enjoys *enough* First Amendment protection to overcome Scott's motion to dismiss. *See, e.g., Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S. Ct. 1319, 1325 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."). We conclude that he does.

a. *Supreme Court Precedent*

In a 1968 case challenging Ohio election laws regulating new political parties being placed on the state ballot, the Supreme Court stated:

> No extended discussion is required to establish that the Ohio laws before us give the two old, established parties a decided advantage over any new parties struggling for existence and thus place substantially unequal burdens on both the right to vote and the right to

17

associate. The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot. In determining whether the state has a power to place such unequal burdens on minority groups where rights of this kind are at stake, the decisions of this Court have consistently held that "only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms." The State has here failed to show any "compelling interest" which justifies imposing such heavy burdens on the right to vote and to associate.

*Williams v. Rhodes*, 393 U.S. 23, 31-32, 89 S. Ct. 5, 10-11 (1968) (*citing NAACP v. Button*, 371 U.S. 415, 438, 83 S. Ct. 328, 341 (1963)). Although the issue of new parties being allowed on the ballot was decided under the Equal Protection Clause of the Fourteenth Amendment, the Court viewed the listing of a party or candidate on the state ballot as a First Amendment right to associate, only to be burdened for a "compelling state interest." *See id.*

Three years later, in a case challenging the large filing fees required by Texas statutes as a condition to having one's name placed on the primary ballot, the Supreme Court stated:

The initial and direct impact of filing fees is felt by aspirants for office, rather than voters, and the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review. However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.

18

*Bullock v. Carter*, 405 U.S. 134, 142-43, 92 S. Ct. 849, 855-56 (1972). The Court thus reaffirmed that the right to candidacy is linked to voters' rights. While there is no "fundamental status to candidacy" requiring the "rigorous standard of review" that is applied in voters' rights cases, there is at least some constitutional right to candidacy. *Id.*

In 1976, the Supreme Court spoke directly to the issue of individual public workers' employment conditioned on supporting a political party, holding that to survive a constitutional challenge:

> conditioning the retention of public employment on the employee's support of the in-party . . . must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.

*Elrod v. Burns*, 427 U.S. 347, 363, 96 S. Ct. 2673, 2685 (1976). Although being a candidate is not the same as supporting a candidate, the two acts are closely related. *See Carter*, 405 U.S. at 142-43, 92 S. Ct. at 855-56. Thus, restricting candidacy, like conditioning public employment on support of a political party, must be the least restrictive means of furthering a "vital government end." *Elrod*, 427 U.S. at 363, 96 S. Ct. 2685.

Finally, speaking directly to candidacy rights, the Supreme Court explained that "[f]ar from recognizing candidacy as a 'fundamental right,' we have held that

19

the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.'" *Clements v. Fashing*, 457 U.S. 957, 963, 102 S. Ct. 2836, 2843 (1982) (*citing Carter*, 405 U.S. at 143, 92 S. Ct. at 856). Rather, "[d]ecision[s] in this area of constitutional adjudication [are] a matter of degree, and involve[ ] a consideration of the facts and circumstances behind the law, the interests the State seeks to protect by placing restrictions on candidacy, and the nature of the interests of those who may be burdened by the restrictions." *Id.* at 963, 102 S. Ct. at 2844. Even though *Clements* does not make clear the degree of constitutional scrutiny required for candidacy restrictions, the Court does suggest that political candidacy is entitled to at least a modicum of constitutional protection.

### b. *Circuit Precedent*

While our circuit precedent describes, in *dicta*, a constitutional right to run for office,[6] our previous case holdings regarding candidacy-terminations all involve plaintiffs who were discharged for supporting a candidate running for office, as opposed to discharges related to running for office themselves.[7]

---

[6] *See Flinn v. Gordon*, 775 F.2d 1551, 1554 (11th Cir. 1985) (stating that a Florida legislator who ran for office "certainly had a constitutional right to run for office and to hold office once elected.").

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent the decisions of the former Fifth Circuit handed down prior to 1 October 1981. While not Eleventh Circuit decisions, two binding former Fifth Circuit decisions

20

Regarding deputy sheriffs, clerks, investigators, dispatchers, jailers, and process servers who were replaced by persons supporting the newly elected sheriff, we held that:

> "[u]nder the *Elrod-Branti* standard, loyalty to the individual sheriff and the goals and policies he seeks to implement through his office is an appropriate requirement for the effective performance of a deputy sheriff. Such a requirement strikes at the heart of the *Elrod-Branti* least restrictive means test which balances first amendment rights of the deputies and the need for efficient and effective delivery of public services. We can find no less restrictive means for meeting the needs of public service in the case of the sheriff's deputy than to acknowledge a sheriff's absolute authority of appointment and to decline to reinstate those who did not support him.
> . . . .
> . . . [However,] [i]t has not been established that loyalty to an individual sheriff is an appropriate requirement for effective job performance for the . . . positions of clerk, investigator, dispatcher, jailer, and process server. This is a determination that depends upon the actual responsibilities of each position and the relationship of each to the sheriff.

*Terry v. Cook*, 866 F.2d 373, 377-78 (11th Cir. 1989). In *Terry*, we balanced the

---

regarding statutory restrictions on the right to run for office speak broadly about candidacy. In *Morial v. Judicial Commission of Louisiana*, 565 F.2d 295 (5th Cir. 1977) (en banc), the Fifth Circuit considered a state law prohibiting sitting judges from running for non-judicial elective office. Although the court ultimately upheld the law through an intermediate scrutiny analysis, in reaching that conclusion it described the plaintiff's interest in running for office as "an important, if not constitutionally 'fundamental' right." *Id*. at 301. Two years later, in *United States v. Tonry*, 605 F.2d 144 (5th Cir. 1979), the Fifth Circuit addressed a probation condition limiting the right of a probationer to participate in political activity. Again applying intermediate scrutiny, the court stated that "[t]here is no question that candidacy for office and participating in political activities are forms of expression protected by the *first amendment*." *Id.* at 150. While the *Morial* and *Tonry* decisions address broad statutory restrictions on a right to candidacy, as opposed to single-case terminations, the language, like that in *Flinn v. Gordon*, outlines a general First Amendment protection.

21

state's interest in office loyalty with the First Amendment rights of the discharged workers. Finding some discharges constitutional, and others not, we concluded that all the discharged-workers did have *some* First Amendment protection. A second and third sheriff deputy-dismissal case reiterated the *Terry* application of the *Elrod-Branti* standard. *See Cutcliffe,* 117 F.3d at 1356-58; *Silva v. Bieluch*, 351 F.3d 1045, 1047 (11th Cir. 2003).

More recently, in *Epps v. Watson,* we addressed whether a county tax commissioner clerk's First Amendment rights were violated when she was discharged by the newly-elected tax commissioner for allowing the commissioner's opponent to place campaign signs on her property. *See Epps v. Watson*, 492 F.3d 1240, 1242 (11th Cir. 2007). Analyzing the issue under *Elrod-Branti* and *Terry*, we concluded that Epps' job did not "require[ ] her to function as the alter ego of the Tax Commissioner or ensure that the policies and goals of the office are implemented." *Id.* at 1245 (quotation marks and citation omitted). Because "Epps was not in any decision making role within the department, . . . [we found that] Epps ha[d] factually alleged the deprivation of a constitutional right to freely associate." *Id.* at 1245 (quotation marks and citations omitted).

In summary, our circuit precedent represents a balancing test between a discharged employee's First Amendment right to support a candidate and the

state's interest in office loyalty.  Each case found that the discharged employee had *some* constitutional protection.

While we have no circuit precedent regarding the right to candidacy in a case squarely similar to this, we conclude the constitutional-right-versus-the-state's-interests analysis to be no different for a restriction on candidacy than a restriction on candidate support.  Scott cites precedent from other circuits regarding an explicit determination that there is no First Amendment right to candidacy, however, each cited case relates to an employee subject to the Hatch Act (which prohibits civil servants from being candidates for elective office) or a discharged-employee running against a discharging-supervisor.  *See, e.g., Molina-Crespo v. United States Merit Sys. Protection Bd.*, 547 F.3d 651, 658 (6th Cir. 1997) (finding that the "[Hatch] Act's prohibition on candidacy for elective office is rationally related to the government's interest because it allows the government to remove actual or apparent partisan influence from the administration of federal funds"); *Carver v. Dennis*, 104 F.3d 847, 852-53 (6th Cir. 1997) (concluding that the discharge of a deputy clerk  after she announced her candidacy for clerk was "neutral in terms of the First Amendment" because "[t]he First Amendment does not require that an official . . . nourish the viper in the nest"); *Bart v. Telford*, 677 F.2d 622, 626 (7th Cir. 1982) (upholding mayor's requirement that employee take

23

leave of absence after announcing intent to run for mayor); *Jantzen v. Hawkins*, 188 F.3d 1247, 1250-52 (10th Cir. 1999) (addressing issue of sheriff warning office employees that anyone opposing his re-election would be seen as disloyal).

c. *Conclusion*

Supreme Court and circuit precedent is not entirely clear regarding the degree of First Amendment protection for candidacy, however, every case addressing the issue has found at least some constitutional protection. A plaintiff's candidacy cannot be burdened because a state official wishes to discourage that candidacy without a whisper of valid state interest. An interest in candidacy, and expression of political views without interference from state officials who wish to discourage that interest and expression, lies at the core of values protected by the First Amendment.

2. *Whether Randall's First Amendment Rights Were Violated?*

We agree that if Randall decided to run against Scott for Clayton County District Attorney, Scott would have good legal reason to discharge him due to the state's interest in office loyalty. That is not the case here. Randall was not discharged for a conflict with Scott or the position of Clayton County District Attorney; Randall's discharge was entirely related to Scott's husband, and Scott's personal relationship with her husband.

24

The district court evaluated Scott's motion to dismiss by first looking at whether Randall could properly allege action qualifying for First Amendment protection. R1-18 at 8. The court split Randall's arguments for potential First Amendment protection into two categories: (1) political patronage – whether he was subjected to an adverse employment action based on his political beliefs or party affiliation, and (2) employee expression – whether he was subjected to an adverse action based on his political speech. *Id.* at 9. We opine that the analysis is different. The dismissal of Randall's complaint can only be affirmed if the state's interest in permitting Scott to fire Randall is of sufficient importance to justify the infringement of Randall's First Amendment right to run for Chairman of the Clayton County Board of Commissioners. These are the same considerations as the *Elrod-Branti* standard applied in *Terry v. Cook* and *Epps v. Watson*. However, we are now comparing the state's interest in preventing an individual from running for office to the individual's First Amendment right to run (as opposed to the state's interest in preventing an individual from supporting a particular candidate compared to the individual's First Amendment right to support a candidate).

Since Scott's interest in firing Randall was, as alleged in the complaint, for purely personal reasons, the state has no interest in preventing Randall from running for office. While we have not decided the level of scrutiny to be applied,

25

Randall's decision to run for office enjoys *some* First Amendment protection. Comparing this level of protection to the state's interest – manifestly none – the dismissal of Randall's complaint cannot be affirmed on the failure to state the denial of a First Amendment right.

C. Qualified Immunity

Randall sued Scott in her individual and official capacities. R1-18 at 1-2. Since federal law provides government officials a qualified immunity when sued individually for an alleged violation of a constitutional right, if Scott can establish qualified immunity, then the individual capacity claim against her must be dismissed. *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 3105-06 (1985); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (per curiam).

Qualified immunity offers complete protection for individual government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).[8] "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when

---

[8] The parties do not dispute that Scott was acting in a discretionary capacity. R1-18 at 7.

26

they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. __, 129 S. Ct. 808, 815 (2009) . In *Saucier v. Katz*, the Supreme Court mandated a two step analysis for resolving qualified immunity claims. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). First, a court must decide whether the facts that a plaintiff has alleged "show the [defendant's] conduct violated a constitutional right." *Id.* Second, the court must decide "whether the right was clearly established."[9] *Id.* For the purposes of this qualified immunity analysis, since we have already determined that Randall had some First Amendment protection violated, we are only concerned with whether the violated right was clearly established.

"Clearly established law" is law that is sufficiently established so as to provide public officials with "fair notice" that the conduct alleged is prohibited. *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002) ("For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that

_____

[9] *Saucier* mandated that courts first determine whether a constitutional violation occurred, and then decide whether the violated right was clearly established. In *Pearson*, the Supreme Court gave courts the discretion to decide which step they address first. 555 U.S. __, 129 S. Ct. at 818.

27

in the light of pre-existing law the unlawfulness must be apparent." (internal citations and quotation omitted)). "[T]he Supreme Court in *Saucier* and *Hope*, as well as this Court en banc in [*Marsh v. Butler County*, 268 F.3d 1014 (11th Cir. 2001) (en banc)], explained that such fair and clear notice can be given in various ways." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002).

First, we turn to broad case law. "When looking at case law, some broad statements of principle . . . can clearly establish law applicable in the future to different sets of detailed facts." *Id.* at 1351; *see also Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). "[I]f some authoritative judicial decision decides a case by determining that 'X Conduct' is unconstitutional without tying that determination to a particularized set of facts, the decision on 'X Conduct' can be read as having clearly established a constitutional principle." *Vinyard*, 311 F.3d at 1351. In the case at hand, based on the scrupulous legal analysis required to determine whether Randall had a First Amendment right violated, we conclude that Randall's rights were not clearly established under broad case law.[10]

Second, we look for a case based on materially similar facts. When looking at materially similar facts, "if the circumstances facing a government official are

---

[10] While *Flinn* did discuss a "constitutional right to run for office," the mentioning was purely *dicta* as opposed to law actually deciding a case as *Vinyard* describes. *Flinn*, 775 F.2d at 1554.

28

not fairly distinguishable [from fact-specific precedent that has established law] . . . the precedent can clearly establish the applicable law." *Id.* at 1352. Since we are aware of no precedential case with similar facts to those described here, we conclude that Randall's rights were not clearly established under materially similar facts.

Third, and finally, Randall "could show that this case fits within the exception of conduct which so obviously violates [the] [C]onstitution that prior case law is unnecessary." *Mercado*, 407 F.3d at 1159. The peculiar facts of Randall's case must be "so far beyond the hazy border between excessive and acceptable that [every objectively reasonable district attorney] had to know that [she] was violating the Constitution even without caselaw on point." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (quotation mark and citation omitted) (concluding that law was clearly established and force was "clearly-excessive-even-in-absence-of-case-law" when officer released police dog to attack plaintiff who did not pose a threat to officers or others). We conclude that Scott's alleged unconstitutional act of working to prevent Randall from running for office was not "obviously" clear.

It appears to us that any such right to run for office was not heretofore clearly established. Scott therefore enjoys individual qualified immunity

protection for her alleged violation of Randall's First Amendment rights. Accordingly we affirm the district court's judgment on the qualified immunity issue regarding Randall's individual capacity claim against Scott.

## III. CONCLUSION

Randall appeals the district court order granting Scott's motion to dismiss. As we have explained: (1) § 1983 cases involving qualified immunity shall now be held to comply with the pleading standards described in *Iqbal*; (2) the allegations described in Randall's complaint are enough to state a claim for violation of his First Amendment rights; and (3) Scott is entitled to qualified immunity because Randall's constitutional rights at issue were not clearly established at the time of Scott's alleged misconduct. Accordingly, the order granting Scott's motion to dismiss is AFFIRMED regarding Randall's individual capacity claim, and REVERSED in regards to Randall's official capacity claim.

**AFFIRMED** in part and **REVERSED** in part, and **REMANDED** for further proceedings consistent with this opinion.