[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13561

_____

JARVIS ARRINGTON,

Plaintiff-Appellant,

SANDRA MUNSTER,
GENEVA BLANCHARD,

Consol Plaintiffs-
Appellants,

MONIQUE MICHEL, et al.,

Consol Plaintiffs,

versus

BURGER KING WORLDWIDE, INC.,
BURGER KING CORPORATION,

Defendants-Appellees,

RESTAURANT BRANDS INTERNATIONAL INC.,

Consol Defendant,

Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:18-cv-24128-JEM

_____

Before WILSON, ROSENBAUM, and HULL, Circuit Judges.

ROSENBAUM, Circuit Judge:

No self-respecting Dolphins fan would ever buy a Jets or Patriots hat (at least not for herself).  And Jets and Patriots fans are pretty unlikely to purchase Dolphins garb (though they are missing the boat on that one).  Put simply, the teams of the National Football League ("NFL") compete against each other not only on the field, but also in the sale of their intellectual property.

So when the 32 teams of the NFL got together and formed National Football League Properties ("Properties") to grant an exclusive license to Reebok International Ltd. to sell all teams'

intellectual property, the Supreme Court concluded that they and Properties undertook "concerted action" for purposes of Section 1 of the Sherman Act. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010). After all, by agreeing to use one exclusive vendor, the 32 teams and Properties had potentially deprived the marketplace of their separate and independent decisions about granting intellectual-property licenses for each team—decisions that could have resulted in the hiring of different vendors with different products and profit margins, instead of just a single, exclusive seller. For this reason, the Supreme Court concluded, the exclusive-licensing decision of the teams and Properties amounted to "concerted action" and satisfied the first condition of Section 1 of the Sherman Act, an antitrust law. *See* 15 U.S.C. § 1 (declaring illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy," in restraint of trade).

While the case before us today is not about football, *American Needle* is instructive here as to the "concerted action" element of a Section 1 claim. And not only because it involves something just as American—hamburger restaurants.

As we explain below, 99% of Burger King restaurants are independently owned franchise restaurants. Each franchise is for a single restaurant at a specific location without any protected (much less exclusive) territory. Franchisees are independent contractors and are not agents or employees of Burger King. And no fiduciary relationship exists between the franchisee and Burger King.

Despite their independence, Burger King and its separately owned franchisees entered a "No-Hire Agreement," under which each agreed not to hire any employees of another Burger King restaurant for at least six months after the employee left employment at another Burger King restaurant. So an employee who just left employment at one Burger King restaurant and wanted to work at a different, higher-paying Burger King restaurant, can't do so for at least six months. The question here is whether, in entering this Agreement, Burger King and its independent franchisees undertook "concerted action" for purposes of Section 1 of the Sherman Act. We conclude that the complaint plausibly alleges they did.

Like the 32 teams and Properties in *American Needle*, Burger King and its separate and independent franchise restaurants compete against each other—in this case, for employees. Even the franchisees' agreements with Burger King say so expressly. So the No-Hire Agreement, like the exclusive-licensing agreement in *American Needle*, deprives the marketplace of potentially different hiring decisions by each of the separate restaurant owners that they might make in their own economic interests in the absence of the No-Hire Agreement. For purposes of the labor market, then, the Plaintiffs here—proposed class representatives of former employees of various Burger King franchisees—plausibly alleged that Burger King and its franchisees engaged in "concerted action" in violation of Section 1 of the Sherman Act.

The district court, though, dismissed the Plaintiffs' complaint on the basis that Burger King and its franchisees constituted

a single economic enterprise and were not capable of the concerted action that a Section 1 violation requires. Because we conclude the complaint plausibly alleged concerted action, we reverse and remand to the district court for further proceedings.

## I.    Background[1]

Founded in 1954, Burger King is one of the largest fast-food restaurant chains in the world. Restaurant Brands International, https://www.rbi.com/English/brands/default.aspx (last visited Aug. 31, 2022). Among its offerings, Burger King is well-known for its Whopper hamburger[2] and chicken fries[3]. Across the globe, more than 18,000 Burger King restaurants dot the landscapes of more than 100 countries and United States territories. *Id.* In the United States, it's tough to travel through an urban area without passing several Burger Kings along the way. Indeed, more than 7,000 Burger King restaurants exist throughout the United States.

But Defendant Restaurant Brands International, Inc. ("Restaurant Brands"), which owns Defendant Burger King Worldwide,

---

[1] Because we are reviewing an order on a motion to dismiss, we present the facts as alleged in Plaintiffs' amended complaint and draw all reasonable inferences in Plaintiffs' favor. *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). The actual facts may or may not be as alleged.

[2] For those who have managed never to have been to a Burger King, a Whopper is a quarter-pound, flame-broiled burger with tomatoes, lettuce, pickles, onions, mayonnaise, and ketchup on a sesame-seed bun.

[3] Again, for the less indoctrinated, chicken fries are essentially chicken nuggets shaped like French fries.

Inc. ("Worldwide"), which, in turn, owns Defendant Burger King Corporation ("Corporation") (we refer collectively to defendants as "Burger King") does not own most of these restaurants. Rather, more than 99% of Burger King's restaurants worldwide are independently owned franchise restaurants. In fact, in the United States, Burger King owns and operates only about 50 restaurants— all in the Miami area.

To obtain a Burger King franchise, a prospective franchisee must sign a standard franchise agreement with the Corporation. The agreement includes a typical term of 20 years and a franchise fee of $50,000 that the franchisee must pay to Burger King. In total, a franchisee generally must make an investment of between $323,000 and $3.1 million to begin operating a Burger King restaurant. But the investment doesn't end there. Once open for business, franchisees pay Burger King royalties of as much as 4.5% of gross sales and an "Advertising Contribution" of 4% of gross sales.

A franchisee's obligations also include non-financial ones. From at least 2010 until at least September 13, 2018, Burger King incorporated into its standard franchise agreement, a "No-Hire Agreement." The "No-Hire Agreement" appears in the franchise agreement under the heading, "Interference with Employment Relations of Others." It binds the Corporation and its franchisees to not attempt to hire away any current employee of the Burger King or of another Burger King franchisee, and not to hire any employee of the Corporation or of another Burger King franchisee for six months after the employee leaves the first Burger King restaurant,

20-13561              Opinion of the Court                7

unless the first Burger King employer gives the later Burger King employer prior written consent.[4] If the Corporation or a franchisee violates the No-Hire Agreement, it must pay all costs and attorneys' fees incurred in any legal action brought to enforce the agreement. And that's not all: the Corporation enjoys the unilateral power to terminate a franchisee's right to operate its Burger King franchise if the franchisee commits an act of default, which includes breach of the No-Hire Agreement.

Beginning in September 2018, Burger King purportedly removed the so-called "no-poach, no-hire language" from new franchise agreements on a going-forward basis. But at that point, thousands of Burger King franchise restaurants already in existence had signed older versions of the agreement, which included the No-Hire Agreement, and continued to operate under them.

This No-Hire Agreement is the source of the dispute here. Plaintiffs were all employees of Burger King franchise restaurants at some point between 2010 and 2018. Jarvis Arrington was a line

---

[4] The No-Hire Agreement states,

Neither BKC nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.

cook for a Burger King franchisee in Illinois until August 2017; Geneva Blanchard has been a crew member for a Burger King franchisee in New Orleans since 2013; and Sandra Munster worked for another franchisee in Illinois for fifteen years, starting as a supervisor and ultimately working her way up to general manager.

Plaintiffs assert that the No-Hire Agreement prevented them from being able to obtain employment at other Burger King franchise restaurants and, as a result, caused them to be paid artificially depressed wages, suffer decreased benefits, and be deprived of job mobility. In Plaintiffs' view, the No-Hire Agreement amounts to an unreasonable restraint on trade, in violation of § 1 of the Sherman Act. Plaintiffs allege that the No-Hire Agreement prohibits Burger King franchisees from competing with each other and with the Corporation in attracting (and retaining) labor.

Because the nature of the relationships among the franchisees and between the franchisees and the Corporation are critical to assessing Plaintiffs' Section 1 Sherman Act claim, we take a moment to further explore them. Burger King restaurants are independently owned and operated by individuals or entities that are intended to be separate legal entities from Burger King. And under the standard franchise agreement, a Burger King franchisee is an "independent contractor and is not an agent, partner, joint venturer, joint employer or employee of [the Corporation], and no fiduciary relationship between the parties exists." To make sure that's clear to the public and to those with whom the franchisees do business, "[i]n all public records and in FRANCHISEE's

relationship with other persons, on stationery, business forms and checks[,] FRANCHISEE shall indicate independent ownership of the [Burger King] Restaurant." And in the franchisee's restaurant, the franchisee must exhibit "a notification that the Franchised Restaurant is operated by an independent operator and not by [the Corporation]."

Consistent with this independence, each franchisee agrees that it is "solely responsible for all aspects of the employment relationship with its employees," and that it enjoys "the sole right to hire, discipline, promote, demote, transfer, discharge, and establish wages, hours, benefits, employment policies, and other terms and conditions of employment for its employees without consultation with or approval by [the Corporation]." The hiring page on Burger King's website reinforces the independence of franchisees' employment decisions, declaring that "[j]ob descriptions, compensation, benefits and other employment terms and conditions applicable to positions at independent franchised BURGER KING® Restaurants will vary and are determined solely by the Franchisee."

With the exception of the No-Hire Agreement, franchisees' Burger King restaurants compete with other franchisees' Burger King restaurants and with Corporate Burger King restaurants. Consistent with this scheme, in the Burger King Franchise Disclosure Document, Burger King advises prospective franchisees that their franchise is for a single restaurant at a specified location and "does not grant [the franchisee] or imply any type of area or territory, exclusive, protected or otherwise, or protected customer

base."    In fact, Burger King expressly warns franchisees that "[o]ther BURGER KING Restaurants may compete with your Restaurant or may affect customer trading patterns.  Because you will not receive an exclusive territory, you may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that [Restaurant Brands] control[s]."

Based on their concerns about the No-Hire Agreement, Plaintiffs filed a complaint alleging antitrust violations.  They asserted that Burger King and its independently owned and operated franchisee stores "have together colluded to depress the wages and employment opportunities of employees who work in Burger King branded restaurants throughout the United States" by "agree[ing] not to solicit or hire each other's employees."  According to Plaintiffs' complaint, the No-Hire Agreement represents an unreasonable restraint of trade.

Burger King responded by moving to dismiss for failure to state a Section 1 Sherman Act claim.  To establish such a claim, a plaintiff must allege facts that plausibly show (1) a contract, combination, or conspiracy that (2) unreasonably (3) restrains interstate or foreign trade.  *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019).

After briefing on Burger King's motion to dismiss, the district court granted the motion and dismissed the action.  In so doing, the court concluded that the complaint flunked the first element of a Section 1 Sherman claim.  More specifically, the court

determined that Burger King and each of its independent franchisees together constituted a single economic enterprise, so they were not capable of conspiring under the Sherman Act. Having held the complaint failed to establish the first element, the district court declined to consider the other two. So it had no reason to evaluate what antitrust approach would apply, had it reached the other two elements. The district court also denied as futile Plaintiffs' request for leave to amend their complaint.

Plaintiffs now appeal.

## II.    Standard of Review

We review de novo a district court order granting a motion to dismiss. *See Gardner v. Mutz*, 962 F.3d 1329, 1338 n.9 (11th Cir. 2020). At the motion-to-dismiss stage, we must accept the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Darrisaw v. Pa. Higher Educ. Assistance Agency*, 949 F.3d 1302, 1303 (11th Cir. 2020).

A district court should grant a motion to dismiss only if the plaintiff has not pled "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). So a district court properly dismisses a complaint for failure to state a claim only when, "ignoring any 'mere conclusory statements,' the remaining allegations do not 'plausibly suggest' that the defendant is liable." *Harper v. Prof'l Prob. Servs. Inc.*, 976 F.3d 1236, 1240 n.4 (11th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009)).

### III.    Discussion

The Sherman Act is an antitrust law that outlaws monopolization and other unreasonable restraints on trade. *See, e.g.*, 15 U.S.C. §§ 1 & 2. In so doing, the law imposes different limitations on antitrust conduct, depending on whether separate entities or individuals act together to take the challenged action, *see* 15 U.S.C. § 1, or whether instead what may be deemed a single actor engages in the activity, *see id.* § 2. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984). The Supreme Court has explained that Congress decided to treat concerted actors and independent actors differently, "authoriz[ing] Sherman Act scrutiny of single firms only when they pose a danger of monopolization" "[i]n part because it is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects." *Id.* at 767–68.

As we have noted, this case involves an alleged Section 1 violation. Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy" that restrains trade or commerce. 15 U.S.C. § 1. Because Plaintiffs raise a Section 1 challenge, at the outset, they must sufficiently allege "concerted . . . action." *Copperweld*, 467 U.S. at 767. After all, by its terms, Section 1 prohibits only "contract[s], combination[s] . . . , [and] conspirac[ies]" that unreasonably restrain trade. *See* 15 U.S.C. § 1.

Here, the district court concluded that Burger King and its franchisees were not separate actors for antitrust purposes. That

is, it found they were incapable of taking "concerted" action for purposes of Section 1 of the Sherman Act. So the court dismissed the complaint and denied Plaintiffs' request to amend. We disagree because the complaint plausibly alleged "concerted action."

To start our analysis, we emphasize that whether an arrangement rises to the level of "concerted . . . action" depends on "substance, not form." *Am. Needle*, 560 U.S. at 195 (citation and quotation marks omitted). Taking a deeper dive into the governing principles, we note that the "key" to ascertaining whether an arrangement amounts to "concerted action" is "whether it joins together separate decisionmakers." *Id.* As the Supreme Court has explained, "[t]he relevant inquiry . . . is whether there is [an arrangement] amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests." *Id.* (cleaned up). "Because the inquiry is one of competitive reality, it is not determinative that two parties to an alleged § 1 violation are legally distinct entities." *Id.* at 196. The question is "whether the agreement joins together independent centers of decisionmaking." *Id.* (internal quotation marks omitted). When we conduct that *American Needle* analysis here, we conclude that the Plaintiffs' complaint plausibly alleges that Burger King and its franchisees' No-Hire Agreement arrangement constitutes concerted action under Section 1.

As we've mentioned, in *American Needle*, the Supreme Court considered whether the 32 teams of the NFL and Properties

engaged in concerted action within the coverage of Section 1 of the Sherman Act when they granted an exclusive license to Reebok International Ltd. to make and sell trademarked headwear for all 32 teams and declined to renew the nonexclusive licenses of other manufacturers that had enjoyed them up to that point. *Id.* at 186. The Court concluded they did. *Id.* at 199–200.

In arriving at this determination, the Court was careful to first specifically identify the decision of the 32 teams and Properties that it was evaluating for purposes of assessing whether they engaged in concerted action:  the decision to grant an exclusive license and decline to renew nonexclusive licenses. *See id.* at 186–87. In this way, *American Needle* teaches that the concerted-action inquiry is a focused one, and we do not consider whether actors engage in concerted activity for all purposes; we evaluate only whether the decision or decisions *in question* involved concerted action.

Here, that means we train our attention on whether Burger King and its independently owned and operated franchisee restaurants undertake concerted activity through the No-Hire Agreement. That is the only activity Plaintiffs challenge under Section 1.

Next, we turn to the "key" question of "whether the [alleged] agreement joins together independent centers of decisionmaking." *Id.* at 196 (internal quotation marks omitted). The question here "is whether there is a 'contract, combination . . . , or conspiracy' amongst 'separate economic actors pursuing separate economic interests,' such that the agreement 'deprives the

marketplace of independent centers of decisionmaking,' and therefore of 'diversity of entrepreneurial interests,' and thus of actual or potential competition." *Id.* at 195 (internal citations omitted). In conducting this analysis in *American Needle*, the Court observed that, despite their common interest in Properties and in promotion of the NFL, the 32 teams "compete[d] with one another, not only on the playing field, but to attract fans, for gate receipts, and for contracts with managerial and playing personnel." *Id.* at 196-97. And "[d]irectly relevant," they also competed against one another in the market for intellectual property, each trying to sell its own separate brand. *Id.* at 197.

So, the Court explained, when the separate teams license their intellectual property, they are not "pursuing the common interests of the whole league" but instead, the interests of each separate team corporation. *Id.* (internal quotation marks omitted). In that way, the teams each act to better their own economic interests and therefore represent "potential independent center[s] of decisionmaking." *Id.* (cleaned up). But when the 32 teams came together to make a decision to license all their trademarks exclusively to one vendor, the Court concluded, they "deprive[d] the marketplace of independent centers of decisionmaking and therefore of actual or potential competition." *Id.* (cleaned up). As the Court observed, the NFL teams were still "separate, profit-maximizing entities and their interests in licensing team trademarks [we]re not necessarily aligned." *Id.* at 198. The Court pointed out that "illegal restraints often are in the common interests of the parties to the

restraint at the expense of those who are not parties." *Id.* In other words, the teams and Properties engaged in "concerted action," for purposes of Section 1 of the Sherman Act.

So too here. Burger King and its franchisees, though they certainly have some economic interests in common, each separately pursue their own economic interests when hiring employees. For starters, the standard franchise agreement expressly emphasizes the "independent" nature of each franchisee's relationship with Burger King, pointing out that "no fiduciary relationship between the parties exists." And as we have mentioned, the Burger King Franchise Disclosure Document explicitly warns that "[o]ther BURGER KING Restaurants may compete with your Restaurant" and that "you may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that [Restaurant Brands] control[s]." Indeed, there's just no question that Burger King and its franchisees compete against each other and have separate and different economic interests.

Not only that, but that independence expressly extends to hiring decisions. Each franchisee agrees that it is "solely responsible for all aspects of the employment relationship with its employees," and that it enjoys "the sole right to hire . . . and establish wages, hours, benefits, employment policies, and other terms and conditions of employment for its employees without consultation with or approval by [the Corporation]." Thus, each franchisee is an independent center of decisionmaking as to hiring or

employment agreements. Burger King's website echoes the independence of franchisees' employment decisions, noting that "[j]ob descriptions, compensation, benefits and other employment terms and conditions applicable to positions at independent franchised BURGER KING® Restaurants will vary and are determined solely by the Franchisee."

Besides that, Plaintiffs alleged (or would have alleged in their proposed amended complaint) that the three franchisees that each of the named Plaintiffs worked for had differing approaches to recruitment on their websites. One "boasts" of various bonuses for managers, including "keys to a Jeep Wrangler or Chevy Camaro for one month." Another attempts to recruit by claiming it "is a wonderful company to work for. With competitive wages, outstanding employee benefits, and a vast variety of positions, all jobs here are accommodating to any schedules." Yet another chooses not to recruit on its own website but prefers to accept applications only through Burger King's website.

So in the absence of the No-Hire Agreement, each independent Burger King restaurant would pursue its own economic interests and therefore potentially and fully make its own hiring decisions, including about wages, hours, and positions. They might even attempt to entice stand-out employees to leave one restaurant and join their own. But the No-Hire Agreement removes that ability and also prohibits the hiring of any Burger King employee for six months after they have left another Burger King restaurant. In this way, the No-Hire Agreement "deprive[s] the marketplace of

independent centers of decisionmaking [about hiring], and therefore of actual or potential competition." 560 U.S. at 197.

For this reason, the Plaintiffs have plausibly alleged that the No-Hire Agreement qualifies under Section 1 of the Sherman Act as "concerted activity," and the Plaintiffs sufficiently alleged that aspect of a Sherman Act Section 1 violation. Thus, the district court should not have dismissed the Plaintiffs' complaint on this basis.

Burger King argues that, even if the district court erred in holding its relationship with its franchisees was not subject to § 1 scrutiny, we may still affirm because, in its view, any restraint on trade was not unreasonable. To so hold would require this Court to determine what level of scrutiny it should apply here—*per se*, quick-look, or rule of reason, *see Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 n.3 (11th Cir. 2016), and then conduct the relevant analysis. We think those inquiries are best left to the district court in the first instance. We therefore decline Burger King's invitation.

## IV.    Conclusion

For the foregoing reasons, we reverse the district court's order dismissing the complaint to the extent it was based on the "concerted action" element for a Section 1 violation, and we remand for further proceedings.

**REVERSED AND REMANDED.**