Majority: LEVY, SILVER, MEAD, GORMAN, AND JABAR, JJ.
Dissent: ALEXANDER, J.
MEAD, J.
[¶ 1] Karen Callaghan and Burton Edwards (the employees) are part-time employees of the City of South Portland. They filed a complaint in the Superior Court (Cumberland County) pursuant to 42 U.S.C.A. § 1983 (West, Westlaw through P.L. 113-22) seeking a declaration that certain provisions of the City’s personnel policy violated their First Amendment rights, and further seeking permanent injunctive relief from the enforcement of those provisions. They then moved for summary judgment.
[¶ 2] The City appeals from the entry by the court (Warren, J.) of a partial summary judgment for the employees and a corresponding permanent injunction barring the City from enforcing a prohibition on any City employee (1) seeking election to or serving on the South Portland School Board; and (2) engaging in certain political activities on their own time, specifically *350 circulating petitions or campaign literature in connection with School Board elections, and soliciting or receiving contributions or political service for or against candidates in School Board elections. Because we conclude that these provisions of the City’s personnel policy violate these employees’ First Amendment rights, we affirm the judgment as it applies to them. We vacate the judgment, however, to the extent that it invalidates the personnel policy as to City employees who are not parties to this action.
I. BACKGROUND
[¶ 3] The facts are not disputed; accordingly, our task is to determine whether either party is entitled to a judgment as a matter of law. M.R. Civ. P. 56(c); see Hayden-Tidd v. Cliff House & Motels, Inc., 2012 ME 111, ¶ 12, 52 A.3d 925 (“Summary judgment provides a procedural mechanism to test the application of law to facts that are not in dispute.”).
[¶ 4] Since 2001, Karen Callaghan has been employed by the City as a part-time circulation librarian in the Library Department. Burton Edwards works for the City’s Parks and Recreation Department about four hours per week on an as-needed basis. Both are subject to the City’s personnel policy, which, following amendments in 2010 and November 2011, provides that City employees' may not
(1) seek or accept nomination or election to any South Portland elective office (i.e., City Council or School Board) ...;
(2) use the influence of his or her employment capacity for or against any candidate for any City elective office;
(3) circulate petitions or campaign literature for any City elective office;
(4) solicit or receive subscriptions, contributions or political service from any person for or against any candidate for any City elective office; or
(5) use City facilities, equipment, materials or supplies to ... assist or advocate for or against any candidate for any county, state, federal, or City elective office regardless of whether he or she is on or off duty.
[¶ 5] In addition to her City employment, Callaghan has served on the South Portland School Board (Board) since 2007. Before the City’s personnel policy was amended in 2010, it permitted Callaghan’s service on the Board, although City employees were barred from serving on the City Council. When Callaghan sought reelection to the Board in 2011, she was advised by the City Clerk that because she had not resigned her City employment, the personnel policy amendments prevented the Clerk from placing her name on the ballot. Following discussions with Callaghan’s attorney, the City Manager advised Callaghan that he would treat her candidacy as “grandfathered,” “[f]or now.”[1] She subsequently ran unopposed, was reelected, and currently serves on the Board.
[¶ 6] At some time before 2010, Edwards had served on the Board for eighteen years; some of that service coincided with his City employment. In December 2010, Edwards expressed an interest in being appointed to fill an existing vacancy on the Board. After the City Clerk questioned whether Edwards could be appointed given his City employment, Edwards decided not to pursue the appointment. *351 He asserts a continued interest in serving on the Board.
[¶ 7] In September 2011, the employees filed a complaint pursuant to 42 U.S.C.A. § 1988,[2] asserting that the City’s personnel policy was “an unconstitutional restraint on political speech” that violated the First Amendment to the United States Constitution.[3] They also moved for a temporary restraining order; that motion was denied because Callaghan’s name was on the ballot, she was running unopposed, and the vacancy Edwards had expressed an interest in no longer existed.
[¶ 8] The employees moved for summary judgment and the City requested summary judgment in its favor. The court granted the employees’ motion in part, permanently enjoining as unconstitutional the personnel policy’s prohibitions against City employees (1) running for and serving on the Board, and (2) participating in Board elections by circulating petitions and campaign literature, soliciting contributions, and contributing political service on their own time. The court let stand provisions barring City employees from participating in Board elections by using the influence of their City jobs, using any City-owned facilities or property, or politicking during working hours. The court made it clear that its order applied only to the School Board, and not to elections involving the City Council or any other elective office. This appeal followed.
II. DISCUSSION
A. Nature of the Employees’ First Amendment Interest
[¶ 9] The employees seek to participate in two activities that implicate the First Amendment: (1) serving on the Board; and (2) circulating petitions and engaging in other campaign-related activities, either for themselves or for other candidates. Identifying the precise degree of constitutional protection those activities enjoy is not an easy task. The Eleventh Circuit has noted that “[precedent in the area of constitutional protection for candidacy can be best described as a legal morass.” Randall v. Scott, 610 F.3d 701, 710 (11th Cir.2010); see Matters v. Estes, No. 1:13:—cv-578, 2013 WL 2403663, at *3 (N.D.N.Y. May 31, 2013) (“The extent of a public employee’s right to run for public office is not clearly established.”).
[¶ 10] A plurality of the United States Supreme Court has stated that candidacy is not a fundamental right such that strict scrutiny is required before it may be restricted. Clements v. Fashing, 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (plurality opinion); see Carver v. Dennis, 104 F.3d 847, 850-51 (6th Cir.1997) (“[T]he [Supreme] Court has never recognized a fundamental right to express one’s political views through candidacy.”).
[¶ 11] That said, although candidacy is not a fundamental right, it is clear that *352 candidacy and related political activities are matters of significant constitutional im-: port. See Clements, 457 U.S. at 977 n. 2, 102 S.Ct. 2836 (Brennan, J., dissenting) (“Although we have never defined candidacy as a fundamental right, we have clearly recognized that restrictions on candidacy impinge on First Amendment rights of candidates and voters.”). The First Circuit has stated unequivocally that “[c]andi-dacy is a First Amendment freedom,” and therefore “the government may place limits on campaigning by public employees [only] if the limits substantially serve government interests that are important enough to outweigh the employees’ First Amendment rights.” Magill v. Lynch, 560 F.2d 22, 27, 29 (1st Cir.1977) (quotation marks omitted). In Randall, the Eleventh Circuit noted that “[w]hile there is no fundamental status to candidacy requiring the rigorous standard of review that is applied in voters’ rights cases, there is at least some constitutional right to candidacy”; accordingly, “restricting candidacy ... must be the least restrictive means of furthering a vital government end.... Even though Clements does not make clear the degree of constitutional scrutiny required for candidacy restrictions, the [Supreme] Court does suggest that political candidacy is entitled to at least a modicum of constitutional protection.” 610 F.3d at 711-12 (quotation marks omitted).
[¶ 12] The Supreme Court itself has recognized “the Constitution’s special concern with threats to the right of citizens to participate in political affairs,” Borough of Duryea, Pa. v. Guarnieri, — U.S. -, 131 S.Ct. 2488, 2498, 180 L.Ed.2d 408 (2011) (quotation marks omitted), and has described “participation in political campaigns” as “close to the core of the First Amendment,” Waters v. Churchill, 511 U.S. 661, 672, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). See also Moen v. Town of Fairfield, 1998 ME 135, ¶ 18, 713 A.2d 321 (noting the Supreme Court’s recognition of “employees’ fundamental constitutional interest in supporting the political candidates of their choice”). Relevant to the employees’ asserted right to be free to circulate petitions and campaign literature and to contribute political service on their own time during Board campaigns, the Supreme Court has said that “[p]etition circulation ... is core political speech, because it involves interactive communication concerning political change.... First Amendment protection for such interaction ... is [therefore] at its zenith.” Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 186-87, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (quotation marks omitted)-. See Randall, 610 F.3d at 711 (“Although being a candidate is not the same as supporting a candidate, the two acts are closely related.”).
[¶ 13] In sum,
[a] plaintiffs candidacy cannot be burdened because a state official wishes to discourage that candidacy without a whisper of valid state interest. An interest in candidacy, and expression of political views without interference from state officials who wish to discourage that interest and expression, lies at the core of values protected by the First Amendment.
Id. at 713. In terms of applying those values and thereby deciding which of the competing interests must prevail in this case between the employees and the City, we are left in the same position in which the First Circuit found itself thirty-six years ago:
What we are obligated to do in this case ... is to apply the [Supreme] Court’s interest balancing approach to the kind of nonpartisan election revealed in this record.... We cannot be more precise than ... characterizing the Court’s ap *353 proach as “some sort of balancing process.” It appears that the government may place limits on campaigning by public employees if the limits substantially serve government interests that are important enough to outweigh the employees’ First Amendment rights.
Magill, 560 F.2d at 27 (citation and additional quotation marks omitted).
B. The Applicable Test
[¶ 14] Like the constitutional interests to be protected, the contours of the balancing test we are to apply are not precisely defined. Nevertheless, as Justice Breyer recently noted:
Regardless of the label [used to describe the standard of review], some ... approach is necessary if the First Amendment is to offer proper protection in the many instances in which a statute adversely affects constitutionally protected interests but warrants neither near-automatic condemnation (as “strict scrutiny” implies) nor near-automatic approval (as is implicit in “rational basis” review).
United States v. Alvarez, — U.S. -, 132 S.Ct. 2537, 2552, 183 L.Ed.2d 574 (2012) (Breyer, J., concurring in the judgment). The Supreme Court has articulated two similar tests that may be employed to balance the important First Amendment rights of prospective candidates and the electorate against the significant interest of the State in maintaining the efficient and trustworthy operation of government.
1. The Pickering test
[¶ 15] In Pickering v. Board of Education, the Supreme Court rejected the notion that the government acting in its role as an employer may impose unlimited restrictions on its employees’ First Amendment rights, at the same time recognizing that the government may lawfully impose some restrictions on employee speech that would be unlawful if imposed on citizens who are not government employees. 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); see also United States v. Nat’l Treasury Emps. Union, 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) [hereinafter NTEU] (“In Pickering and a number of other cases we have recognized that Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large.”); Waters, 511 U.S. at 671, 114 S.Ct. 1878 (“[T]he government as employer indeed has far broader powers than does the government as sovereign.”).
[¶ 16] Pickering announced a balancing test for analyzing public employees’ First Amendment claims, which the Supreme Court has consistently employed in subsequent cases: “The problem in any case is to arrive at a balance between the interests of the ... citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.” 391 U.S. at 568, 88 S.Ct. 1731. See also NTEU, 513 U.S. at 465-66, 115 S.Ct. 1003; id. at 480, 115 S.Ct. 1003 (O’Connor, J., concurring in the judgment in part) (“The time-tested Pickering balance ... provides the governing framework for analysis of all manner of restrictions on speech by the government as employer.”); Waters, 511 U.S. at 668, 114 S.Ct. 1878; Rankin v. McPherson, 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).
[¶ 17] Accordingly, when, as here,
a public employee sues a government employer under the First Amendment’s Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern.... Even if an *354 employee does speak as a citizen on a matter of public concern, the employee’s speech is not automatically privileged. Courts balance the First Amendment interest of the employee against “the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.” This framework reconcile[s] the employee’s right to engage in speech and the government employer’s right to protect its own legitimate interests in performing its mission.
Borough of Duryea, Pa., 131 S.Ct. at 2493 (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)) (citation and additional quotation marks omitted).
[¶ 18] Whether an employee’s speech in a particular case involves a matter of public concern and, if so, whether the governmental employer can demonstrate that its interest outweighs the employee’s interest in engaging in that speech, are each questions of law reviewed de novo. Moen, 1998 ME 135, ¶¶ 14-15, 713 A.2d 321. “[T]he balance we must strike ... is driven entirely by the individual facts of th[e] case ... considering] the importance of the public speech at issue_” Id. ¶.23; see also Andrews v. Dep’t of Envtl. Prot., 1998 ME 198, ¶ 15, 716 A.2d 212 (noting that “the degree of First Amendment protection afforded by Pickering depends upon [a] fact-based balancing test”).
2. The Anderson test ■
[¶ 19] In contrast to Pickering, which focused on the First Amendment rights of government employees' to speak on matters of public concern, in Anderson v. Cele-brezze the Supreme Court examined the First Amendment rights of voters to have candidates for whom they might wish to vote appear on the ballot. 460 U.S. 780, 786, 806, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). The Court first observed that “[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights.” Id. at 786, 103 S.Ct. 1564. To weigh those rights against the government’s interest in elections that are “fair and honest and [accompanied by] some sort of order, rather than chaos,” id. at 788, 103 S.Ct. 1564 (quotation marks omitted), the Court articulated a balancing test that is very similar to, and no more definitive than, the balancing test it set out in Pickering:
[A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the ■ plaintiffs rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. The results of this evaluation will not be automatic; as we have recognized, there is no substitute for the hard judgments that must be made.
Id. at 789, 103 S.Ct. 1564 (citation and quotation marks omitted).
[¶ 20] This test, like the Pickering test, requires a reviewing court to (1) identify the First Amendment interest asserted by the employee/citizen and the magnitude of that interest; (2) identify the government’s interest in restricting the First Amendment interest at issue, the strength of the justification for the restriction, and the extent to which the restriction is necessary *355 to vindicate the government’s interest; and then (3) balance factors (1) and (2) in making a determination as to which outweighs the other given the facts of a particular case.
3. Hatch Act concerns
[¶ 21] Before proceeding to an application of these balancing tests to the facts of this case, we take note of, and find to be unpersuasive, the City’s argument that this case should be viewed as a straightforward Hatch Act case and resolved as such. In general, the federal Hatch Act, 5 U.S.C.A. §§ 7321-7326 (West, Westlaw through P.L. 113-22), and its Maine counterpart, 5 M.R.S. § 7056-A (2012), prohibit certain political activity by covered government employees. The City argues that because the Supreme Court has upheld some restrictions on government employee political activity under the Hatch Act, the restrictions at issue here are per se constitutional. Even in cases where the Hatch Act is discussed, however, the Supreme Court has noted the applicability of the Pickering test when First Amendment rights are at issue. See NTEU, 513 U.S. at 467, 115 S.Ct. 1003; U.S. Civil Serv. Comm’n v. Nat’l Ass’n of Letter Carriers, 413 U.S. 548, 564, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (applying Pickering test to limitations on partisan activity imposed by Hatch Act).
[¶22] In any event, the Hatch Act as construed by the Supreme Court, and 5 M.R.S. § 7056-A by its explicit terms, apply to partisan political activity. See NTEU, 513 U.S. at 470-71, 115 S.Ct. 1003; Broadrick v. Oklahoma, 413 U.S. 601, 606, 616-17, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); Nat’l Ass’n of Letter Carriers, 413 U.S. at 556, 93 S.Ct. 2880; see also Blaylock v. U.S. Merit Sys. Prot. Bd., 851 F.2d 1348, 1351-54 (11th Cir.1988) (explaining Hatch Act’s focus on partisan activity). For example, the Maine equivalent of the Hatch Act explicitly allows state employees to run as “a candidate for public office in a nonpartisan election,” 5 M.R.S. § 7056-A(6)(D), and even as a candidate in a partisan election for a local office, id. § 7056-A(4). Elections to the South Portland School Board are nonpartisan. Accordingly, Hatch Act philosophical concerns for efficient, corruption-free government are helpful here to the extent that they inform the governmental interest side of the balancing ledger, but they are not independently determinative of the analysis in this matter.
C. Application of the Pickering and Anderson Tests to These Facts
[¶ 23] Initially, we conclude that it is not necessary for us to choose either the Pickering test or the Anderson test to the exclusion of the other because the First Amendment interests asserted by the employees prevail under either test. On the facts of this case, satisfying Pickering necessarily satisfies the similar requirements of Anderson.
[¶ 24] The first part of the Pickering test requires the employees to show that their right to run for election to the Board and to engage in political activity in regard to Board elections is speech involving a matter of public concern. See Moen, 1998 ME 135, ¶ 14, 713 A.2d 321. The employees have met their burden here. By offering themselves as candidates for service on the Board, they seek to communicate to the electorate their positions on issues concerning South Portland schools and their ideas for improving the community’s school system. See Connick, 461 U.S. at 145, 103 S.Ct. 1684 (“[T]he Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.” (quotation *356 marks omitted)). Such communication “fall[s] within the protected category of citizen comment on matters of public concern rather than employee comment on matters related to personal status in the workplace.”[4] NTEU, 513 U.S. at 466, 115 S.Ct. 1003. From the community’s perspective, the selection of members of the community to serve on the Board is unquestionably a matter of public concern. Finally, as we have discussed, candidacy for office is subject to some measure of First Amendment protection.
[¶ 25] The employees having satisfied their burden on the first prong of the test, the burden then shifts to the City to demonstrate that “its interest, as an employer, in providing efficient public services outweighs the employee[s’] interest[s].” Moen, 1998 ME 135, ¶ 14, 713 A.2d 321. The Supreme Court has recognized that precisely describing that burden is difficult because it varies with the facts in every case:
Pickering unmistakably states ... that the State’s burden ... varies depending upon the nature of the employee’s expression. Although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests.
Because of the enormous variety of fact situations ... we do not deem it either appropriate or feasible to attempt to lay down a general standard....
Connick, 461 U.S. at 150, 154, 103 S.Ct. 1684 (quotation marks omitted); see Moen, 1998 ME 135, ¶ 23, 713 A.2d 321 (“the balance ... is driven entirely by the individual facts of th[e] case”).
[¶ 26] In this case the magnitude of the City’s intrusion on the employees’ interests in participating in the School Board electoral process — interests that lie “close to the core of the First Amendment,” Waters, 511 U.S. at 672, 114 S.Ct. 1878 — is high. As a result, the City’s burden of justification to show that its interests as an employer outweigh the employees’ interests is correspondingly high. See NTEU, 513 U.S. at 483, 115 S.Ct. 1003 (O’Connor, J., concurring in the judgment in part) (“As the magnitude of intrusion on employees’ interests rises, so does the Government’s burden of justification.”); In re R.M.J., 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) (stating that in order to regulate nonmisleading commercial speech, “the State must assert a substantial interest and the interference with speech must be in proportion to the interest served”); Moen, 1998 ME 135, ¶ 23, 713 A.2d 321 (stating that the Pickering analysis requires consideration of “the importance of the public speech at issue”).
[¶ 27] Furthermore, “unlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens.” NTEU, 513 U.S. at 468, 115 S.Ct. 1003. The City’s personnel policy chills the employees’ prospective candidacy for the Board and potential participation in Board campaigns, activity implicating the First Amendment, by raising the specter of an adverse employment action should they engage in it. Accordingly, “the [City’s] burden is greater with respect to this ... restriction on expression than *357 with respect to an isolated disciplinary action.” Id.
[¶ 28] Taking these principles into account, the City must demonstrate that the interests of both (1) the employees, and (2) the citizens of South Portland who may want the employees to represent them on the Board, or who may want a candidate to serve that would benefit from the employees’ active support, “are outweighed by that expression’s necessary impact on the actual operation of the Government.” Id. (emphasis added) (quotation marks omitted). Although it has a significant burden, the City’s interest is not negligible, as the Supreme Court has recognized: “The government’s interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.” Waters, 511 U.S. at 675, 114 S.Ct. 1878. “Interference with work, personnel relationships, or the speaker’s job performance can detract from the public employer’s function; avoiding such interference can be a strong state interest.” Rankin, 483 U.S. at 388, 107 S.Ct. 2891. Accordingly, we are mindful that “[t]he Pickering balance requires full consideration of the government’s interest in the effective and efficient fulfillment of its responsibilities to the public.” Connick, 461 U.S. at 150, 103 S.Ct. 1684.
[¶ 29] Against this legal backdrop we turn to the ultimate question: whether, on these facts, the City demonstrated a “necessary impact on the actual operation of the Government,” NTEU, 513 U.S. at 468, 115 S.Ct. 1003 (quotation marks omitted), sufficient to outweigh the employees’ demonstrably strong First Amendment interest in running for election to the Board or actively participating on their own time in Board campaigns. We conclude that the Superior Court correctly found that the City has not met that burden because it failed to demonstrate that these employees’ Board-related political activities would have an actual impact on municipal government operations, as opposed to a speculative or theoretical impact.
[¶ 30] The City’s justification for the personnel policy’s restrictions is grounded wholly within the affidavits submitted by the City, principally the affidavit of James Gailey, the South Portland City Manager. His affidavit describes the interaction between the city operations side of South Portland government, headed by the City Manager, and the school department, headed by the Board. In sum, Gailey avers that (1) the Board manages the schools, submits an annual budget to the City Council for approval, and must have its debt addressed by the Council; (2) the City Manager has occasional contact with members of the Board about school-related issues; (3) the Board furnishes budget estimates to the Manager, and other reports when requested; and (4) some functions and costs are shared by the city operations side of municipal government and the school department, such as insurance, annual independent auditing, payroll software, the purchase of bulk commodities, utilities, and increasingly consolidated information technology departments.
[¶ 31] Nowhere does Galley’s affidavit assert that he has any disciplinary authority over or direct influence on members of the Board as such, nor does it recite that a member of the Board has any authority over him or any other employee on the city operations side of South Portland government. The affidavit sets out a list of laudable goals for municipal government that Gailey proffers as justification for the personnel policy at issue,[5] but it *358 does not establish how any of these goals is actually hindered by the service of a part-time librarian or part-time parks and recreation worker on the Board. To the contrary, despite Callaghan’s and Edwards’s service on the Board for a total of twenty-three years, the City offers no instance, or even a suggestion of an instance, where their membership on the Board and simultaneous employment in another City department created any actual difficulty - or interference with the goals for municipal- government that Gai-ley identifies. Furthermore, the affidavit does not cite a single instance of any adverse impact on the operation of City government occurring as a result of any City employee serving on the Board in the years before 2010, years when such service was not prohibited by the personnel policy.
[¶ 32] Some of the most serious evils postulated in Gailey’s affidavit, for example an employee “using [his] employment status with the City, or City work time, to influence local elections”; “using ‘company time’ to collect petition signatures for local elections or e-mail[ing] fellow employees or members of the general public about local elections”; or engaging in politicking “to influence fellow employees or members of the general public with whom they come into contact as part of their employment”; remain prohibited by the portions of the personnel policy affirmed by the Superior Court, meaning that if an employee engaged in those activities, he or she would still be subject to discipline. Another justification asserted by the Gailey affidavit that would be of serious concern if actually present, namely “preventing] a situation where a subordinate employee runs against a supervisor,” cannot occur here because the ban on City employees running for City Council remains in place, and the School Board has no supervisory authority over City employees.[6] In sum, the core threats to municipal administration identified by Gailey are not presented in any fashion by Callaghan and Edwards serving on the School Board.
[¶ 33] Viewing the facts objectively, following the Superior Court’s judgment the City retains effective weapons in its personnel policy to neutralize what it terms the “viper in the nest” — thus far purely theoretical — that it fears. The most concrete impact on the actual operation of City government demonstrated by Gailey’s affidavit is his assertion that it would “likely be awkward” if he were involved in a disciplinary action against a City employee who also served on the Board, or “would be awkward” if he requested budget estimates or reports from the Board if a member was also a City employee. As the trial court concluded, it might be personally uncomfortable if the City Manager was in a position to discipline a Board member for some incident that occurred in the course of his or her City employment, but the Manager’s personal discomfort falls far short of the strong showing of a necessary impact on the actual operation of City *359 government required under the Pickering analysis before these City employees’ First Amendment rights may be restricted.[7]
[¶ 34] Because, on the facts of this case, and with specific regard to School Board elections and these employees, the City has not “demonstrated that its interest, as an employer, in providing efficient public services outweighs the employee’s interest, as a citizen, in commenting on a matter of public concern,” Moen, 1998 ME 135, ¶ 14, 713 A.2d 321, the Superior Court correctly found that the personnel policy’s prohibitions on these two employees running for election to the Board or actively participating in Board elections on their own time violate the First Amendment.[8]
D. Remedy
[¶ 35] The court went beyond the unique circumstances of these two employees, however, and enjoined the policy’s enforcement against all City employees. We do not think it necessary or advisable to do so in this case, choosing instead to follow the Supreme Court’s prudent advice that “although the occasional ease requires us to entertain a facial challenge ... we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants.”[9] NTEU, 513 U.S. at 477-78, 115 S.Ct. 1003.
[¶ 36] At oral argument, the employees conceded that the City could lawfully prohibit some City employees from running for the Board, for example the City Manager himself and perhaps supervisors or those employees with direct input into the City’s budgetary process, but they offered no principled dividing line to separate employees who could lawfully be barred from running from those who could not. We decline to usurp the role of City officials in drawing that line beyond fulfilling our responsibility to say that under the factual circumstances of this case, these two employees could not, consistent with the First Amendment, be prohibited from running or participating in Board elections. Although a blanket prohibition would doubtless be easier for the City to enforce, here it overreaches, and our “acknowledging the difficulty of rendering a concise formulation, or recognizing the possibility of borderline cases, does not disable us from identifying cases far from any troublesome border.” Brown v. Hartlage, 456 U.S. 45, 56, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982). That said, it is best left to City officials more intimately familiar with the inner workings of South Portland municipal government than we to promulgate a policy that both promotes efficient government and does not offend the First Amendment rights of its employees.
The entry is:
*360 As to these plaintiffs, judgment affirmed. As to other City of South Portland employees, judgment vacated. Remanded for further proceedings consistent with this opinion.

. Callaghan’s one-time "grandfathering” was formalized in the November 2011 amendment to the personnel policy. Pursuant to the current language, the City Manager would not have similar discretion should Callaghan again decide to run for reelection to the Board.

. Title 42 U.S.C.A. § 1983 (West, Westlaw through P.L. 113-22) provides, in part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
The City is a "person” subject to suit for purposes of the statute. See Richards v. Town of Eliot, 2001 ME 132, ¶ 38, 780 A.2d 281; Polk v. Town of Lubec, 2000 ME 152, ¶ 12, 756 A.2d 510; Moen v. Town of Fairfield, 1998 ME 135, ¶ 7 n. 3, 713 A.2d 321.

. The employees did not, and do not now, assert a separate violation of article I, section 4 of the Maine Constitution.

. The Pickering test does not apply when a government employee speaks "as an employee upon matters only of personal interest” rather than "as a citizen upon matters of public concern.” United States v. Nat’l Treasury Emp. Union, 513 U.S. 454, 466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (quotation marks omitted). For example, “private speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer.” Id.

. In part, Gailey avers that
[w]ith regard to ... the "political activity" *358 provision of the Personnel Policy, there are a number of reasons why I want this provision in the Personnel Policy. I want there to be efficient and effective municipal government operations; I want a municipal government that enjoys public confidence; I want individual citizens to be free of municipal governmental discrimination based on their political activities or connections; I want municipal government employees to be free of employer pressure in their personal political decisions; and I want to prevent a situation where a subordinate employee runs against a supervisor.

. Nor could a school department employee run for election to the Board and thereby gain authority over his or her supervisor; that possibility is foreclosed by statute. See 20-A M.R.S. § 1002(2) (2012).

. Why it would be awkward for the City Manager to request routine budget information from the Board if one or more of its members was also a City employee is, as the Superior Court also concluded, not apparent.

. We remain true to our rule that "[o]rdi-nances are presumed constitutional.” Fitanides v. City of Saco, 2004 ME 32, ¶ 10, 843 A.2d 8. Callaghan and Edwards met their initial burden to show that the personnel policy restricted their efforts to speak on matters of public concern. If they had not met that burden, the policy's presumption of constitutionality would remain, and the City would prevail. See id. ¶ 14. Thus we have done what the dissent contends we failed to do, which is to “initially presume that the ordinance is constitutional.” Dissenting Opinion ¶ 50.

.Positive relief is required for these plaintiffs, however, because the factual record is complete. The parties had a full opportunity to present facts at the summary judgment level, and the facts they presented were essentially uncontroverted. Thus, there is no reason for us to simply remand this matter to the trial court for further fact-finding.