STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No. BCD-CV-2019-43

JONATHAN ENO and
KAREN GILFILLAN-ENO,

        Plaintiffs,

    v.

TOWN OF BAR HARBOR,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)

JUDGMENT ON A STIPULATED
RECORD IN FAVOR OF
DEFENDANT TOWN OF BAR HARBOR

The parties seek the Court's determination on whether the increase in the vacation rental registration fee (the "Fee") adopted by Defendant Town of Bar Harbor (the "Town") as of 2019 (1) violates 30-A M.R.S. §§ 3702 and 4355 because the Town did not know what its costs were at the time the Fee was adopted, and (2) constitutes an illegal tax under Article IV, part 3, section 9 of the Maine Constitution. For the reasons discussed below, the Court concludes that the Fee does not run afoul of Title 30-A and is not an illegal tax under the Maine Constitution. The Court renders judgment in favor of the Town on both counts.

## FACTS

The parties have agreed to a Stipulated Statement of Facts ("SSF") upon which they ask the Court to determine the Fee's validity and constitutionality. The SSF consists of one hundred and eleven numbered paragraphs and nine exhibits. The SSF along with its exhibits constitute the stipulated record. Based upon the stipulated record, and drawing all reasonable inferences therefrom, *see Rose v. Parsons*, 2015 ME 73, ¶ 8, 118 A.3d 220, the Court finds as follows:

Plaintiffs Jonathan Eno and Karen Gilfillian-Eno (the "Enos") own a property in the Town of Bar Harbor identified as Bar Harbor Tax Map 217 Lot 11 (the "Property"). In 2019 the Property

1

was assessed at a value of $1,517,300. Currently, the Property is listed for sale at $1,999,999 and to rent for $5,000 to $7,500 per week.

**Before Increasing the Fee**

In April 2017, the Enos applied to the Bar Harbor Code Enforcement Officer (the "CEO") for a permit to use a dwelling located on the Property as a vacation rental, as then defined in the Bar Harbor Vacation Rental Ordinance ("VRO") and the Bar Harbor Land Use Ordinance ("LUO").[1] At the time of the Enos' application, the VRO required an initial inspection of the premises to be used as a vacation rental, and payment of a one-time registration fee of $50.00. The VRO at that time did not require any recurrent registration fees or inspections.

On April 26, 2017, the Town inspected the dwelling on the Property. The Enos paid a one-time registration fee of $50.00, and the Town issued them a vacation rental permit.

In 2018, as part of an effort to address problems related to vacation rentals in Bar Harbor, Town Manager Cornell Knight ("Knight") asked CEO Angela Chamberlain ("Chamberlain") to gather information on services provided by Host Compliance. Host Compliance is a company that "specializes in providing short-term rental compliance monitoring and enforcement solutions to local governments." Ex. D. On December 11, 2108, Chamberlain participated in a conference call with Kyle Salonga ("Salonga"), a representative of Host Compliance. Chamberlain shared with Salonga the Town's concerns, and information concerning the short-term rental market in the Town. Salonga reported that the national average for vacation rental registration fees was $250 per year and that some communities charge double the rate of the average night stay. He further reported that most communities require annual registrations, as opposed to having a one-time registration.

---

[1] The LUO definition of "vacation rental" was amended on November 5, 2019 to include portions of dwellings rather than being limited only to entire dwellings.

Following the conference call, Host Compliance sent Chamberlain a forty-four-page report entitled "Cost-effective solutions to Bar Harbor's short-term rental monitoring and compliance problems." Ex. C. The report includes a detailed analysis of the Town's vacation rental market, along with a map showing the location of the Town's short-term rentals. The report calculates that the nightly median rate for a stay at a Bar Harbor vacation rental unit is $265. The report also describes the many ways in which vacation rentals can negatively impact a community.

On December 14, 2018, Chamberlain wrote a memo to Knight summarizing the information she received from Host Compliance. Between December 14 and 18, 2018, Knight provided the memo to the Bar Harbor Town Council ("the Council").[2] On December 18, 2018, the Council met to discuss a proposed amendment to the VRO that would require annual registration of vacation rentals, along with annual payment of the registration fee. The Council also discussed a proposal to increase the $50 registration fee to $250. Based on the number of registered vacation rentals in Bar Harbor at the time, the Council predicted the higher fee would result in approximately $120,000 in annual revenue. The Council also discussed hiring Host Compliance to help enforce the VRO for $28,000 per year, and changing the vacation rental inspections from a one-time requirement to an annual or semi-annual requirement. On December 18, 2018, the Council voted to approve increasing the vacation rental registration fee to $250. The Council rejected a motion to increase the fee to $500.

The Council met on January 24, 2018 to tentatively approve a proposed budget for the fiscal year beginning July 1, 2019. The Council met again on February 19, 2019 to vote on amending the VRO to change the vacation rental registration to an annual requirement. The Council meeting included a discussion of program costs associated with the VRO. Knight said

---

[2] The Town Manager is not a member of the Town Council.

that costs could include not only the $28,000 for a company like Host Compliance, but also the time the CEO, the fire chief, and the administrative assistants spend processing applications. Knight said that if there was any fee-raised revenue left, the balance would be subtracted from taxes. Individual Councilors had varying views on costs and whether there would be an excess of revenue from the Fee after enforcement and administrative costs. One Councilor thought there were higher costs associated with weekly rentals while other Councilors thought there would be excess revenue that could be applied to related housing issues. One Councilor noted he did not know what the exact cost of enforcement would be. Another Councilor stated it was unlikely that there would be any leftover money. After discussion, the Council voted in favor of amending the VRO to make the registration Fee an annual requirement as of March 21, 2019.

On June 4, 2019, at the Bar Harbor Town Meeting, voters approved a budget for the fiscal year beginning on July 1, 2019 that incorporated a schedule of fees that included the $250 annual vacation rental registration Fee. In the budget, there was planned Fee revenue of $120,000. The budget also included an expenditure of $28,000 for the cost of contracting with Host Compliance to help enforce the VRO. As budgeted, revenue from vacation rental registrations goes into the Town's General Fund. In the event that the Town's expenses relating to vacation rental enforcement and administration costs fall below the planned revenue of $120,000, the excess could increase the balance of the Town's General Fund leading to a proportionate decrease in the tax burden of Bar Harbor taxpayers the following tax year, or offset other expenses that run over-budget.

**After Increasing the Fee**

As planned for in the budget, the Fee increased from $50 to $250 on July 1, 2019 at the beginning on the new fiscal year. The Town, however, did not enter into a contract with Host

Compliance. Instead of using Host Compliance, the Town opted to keep VRO administration and enforcement measures in-house. To aid it, the Town contracted with the subscription service AirDNA to provide them with vacation rental data and analytics for $1,800 per year.[3] To assist actual enforcement efforts, the Town also hired an Assistant Code Enforcement Officer ("ACEO") to assist the CEO. Since increasing the Fee, the Town has collected data and been able to calculate the program costs of enforcing and administering the VRO.

In 2019, the Town processed 189 new VRO applications and 297 renewal applications. A "best case scenario" vacation rental application is an application that has no setbacks, can be approved efficiently, and requires only one inspection. One "best case scenario" application costs $104.38.[4] When multiplied by 189 for all the new applications, the "best case scenario" cost for new applications is $19,727. For "best case scenario" renewals, one renewal application costs $46.44.[5] When multiplied by 297, the "best case scenario" cost for renewal applications is $13,782.

However, actual processing costs far exceed those numbers because most applications are not "best case scenario" applications. Approximately ten percent of inspections need to be rescheduled due to applicants failing to appear or because the Fire Department had an emergency to respond to. Roughly seventy-five percent of new registrations fail on the first inspection, and ten percent of new vacation rental registrations require three or more visits to inspect the intended rental. Additionally, the Town's operational costs are occasionally increased due to the Fire Department use of an emergency vehicle to attend the inspection due to the unavailability of non-emergency vehicles. There are also additional staffing costs due to communication issues between

---

[3] The price difference between Host Compliance and AirDNA can be attributed to a significant difference in the services offered by the two companies.

[4] A "best case scenario" vacation rental application can be processed in 2 hours and 10 minutes and is estimated to cost $98.58 per application. In addition, the average round trip is 10 miles at a rate of $0.58 per mile or $5.80 roundtrip. Therefore a "best case scenario" application has a base rate of $104.38.

[5] "Best case scenario" renewals take the CEO or ACEO approximately one hour and ten minutes.

Town employees and applicants. Usually the Fire Department must reach out multiple times to applicants to set up inspection appointments. Similarly, nearly half of all applications require the CEO staff to repeatedly call applicants after their rental has passed inspection to remind them that they need to coordinate payment on order to finish registration and be issued a permit. The CEO office also incurs costs when it has to write and send letters to applicants and those violating the VRO.

To determine the true cost of processing applications, the Town conducted a sampling of thirty-four new, complete permits. The sampling showed that on average it costs $148.10, not $104.38, to process new applications. This brings the estimated cost of processing the 189 new applications to $27,992, which is 41.9% higher than the "best case" scenario calculation. Applying the same percentage increase to renewal applications brings the actual processing cost of renewal applications to $19,571. Thus, total actual direct processing costs (for new and renewal applications) amount to $47,563.

Of course, direct application processing costs are not the only costs involved with the VRO. In addition to the work of staff involved with processing applications, the Bar Harbor Fire Chief, CEO, ACEO, and five Fire Department Staff each spend at least four hours per week working on general tasks related to the VRO. These tasks include, but are not limited to, answering public inquiries on the VRO or the application process; engaging in internal discussions about the VRO, applications, procedures, etc.; preparing and adjusting forms and applications; and general record keeping. For the eight employees to perform these tasks for four hours a week, at their respective hourly rate costs $641.32 per week, or $33,348 per year.

If you add direct actual processing costs ($47,563), general expenditures ($33,348), and the AirDNA subscription ($1,800), the result is $82,712 per year.[6] This figure represents the theoretical minimum annual amount of VRO program costs, but this number is an underestimation because some applications cost significantly more than others, and there are frequently special administrative expenses involved.

As an example of significantly higher application costs, one particular case cost the town $755.39 in expenses. In the example case, one vacation rental applicant had two units for which the owner wished to obtain vacation rental permits. Processing the application required three inspections of the two units, at least twenty phone calls, an issuance of a Notice of Violation, and travel costs for the multiple inspections. These costs amounted to $377.70 per application. If this rate were applied to processing new and renewal applications, the Town's projected VRO program costs would swell to $142,700 annually. Obviously, not all applications are this costly, but the fact that some are confirms the conclusion that the $82,712 figure under-represents costs.

Further, these numbers don't include the costs associated with special administrative projects, police response to vacation rental property calls, enforcement actions, and unquantifiable costs. In 2019, special administrative projects related to vacation rentals cost $6,808.00. In the first few weeks of 2020, special administrative projects overhead reached $6,776, primarily due to a series of public listening sessions regarding vacation rentals. Additionally, between 2018-2019, the average cost for police to respond to calls at vacation rental properties was $1,612 per year. The Town also anticipates increased administrative and legal costs due to its desire to take a more

---

[6] These numbers are rounded to the nearest full dollar amount.

proactive stance on enforcement.[7] Finally, the Town incurs difficult to quantify costs associated with parking, trash removal, and social problems due to the presence of vacation rentals.

Based on all of the above, the Court finds that the Town's VRO annual program costs range between $82,712 and $142,700. The median in this range is $112,706 annually.

## DISCUSSION

The Enos do not seriously dispute that the analysis conducted by the Town *after* it increased the Fee establishes that the annual $250 Fee reasonably reflects, and does not materially exceed, the Town's annual costs associated with the VRO program. Indeed, the Court concludes as much, as a matter of fact and law. The Town anticipates the increased Fee will generate approximately $120,000 in annual program revenue, and annual program costs range from $82,712 to $142,700, with an annual medium of $112,706. Program revenue and program costs are thus in approximate balance. The Enos assert, however, that because the Town did not know this *before* it increased the Fee, the Fee is invalid and constitutes an illegal tax. The entire thrust of the Enos' case is that the Town was required to know its costs *before* enacting the higher Fee, in order to be reasonably confident the Fee and program costs would be in approximate balance. For the reasons discussed below, the Court determines that the Fee was lawfully established pursuant to Title 30-A and does not constitute an unconstitutional tax.

**Fee Provisions of Title 30-A**

The Enos contend that the provisions of 30-A M.R.S. § 3702 and 4355 both apply to the Town's setting of the annual $250 fee in connection with the Town's VRO. The Court will examine each of these provisions in turn.

---

[7] Defendant offers *Town of Bar Harbor v. Robert L. Jordan et al.,* CV-18-221 as an example of the expenses they anticipate incurring when taking legal action against Ordinance violations. In *Jordan*, the Town incurred $4,416.64 in attorney fees, but ultimately agreed to a settlement case that awarded them $1,500. Overall, the legal action cost Defendant $2,916.64 in attorney fees.

8

***The Fee Complies with 30-A M.R.S. § 3702***

Applicability

The Enos contend that 30-A M.R.S. § 3702 applies to the Fee pursuant to 30-A M.R.S. § 4101(2). Section 4101(2) "applies to any municipal ordinance requiring a permit in connection with" the "maintenance, repair, use, change of use, safety features . . . of any building." Section 3702 dictates that "[u]nless otherwise provided by law, any fee established by a municipality for any license or permit under this subpart" must satisfy the terms of Section 3702. Sections 4102 and 3702 are both contained within Subpart 6 of Title 30-A. Therefore, any ordinance governed by Section 4101 that imposes a fee must also meet the requirements of Section 3702.

The Town argues against applicability, on the grounds that the VRO requires annual registrations and there is no change of use when a vacation rental permit is renewed. (Def.'s Br. 12.) Section 4101(2), however, applies not only to "change of use" permits, but also to permits in connection with "use" and "safety features." The VRO requires a permit to begin using a dwelling or portion thereof as a vacation rental and requires a safety inspection before a permit can be issued. The VRO thus fits comfortably within the scope of Section 4101. It follows, therefore, that Section 3702 is applicable to the vacation rental fee.

"Reasonably Reflect"

Section 3702 provides that any fee to which it applies "must reasonably reflect the municipality's costs associated with the license or permit procedure and enforcement." The Enos argue that the language of Section 3702 requires municipalities to know the costs of permitting and enforcement before authorizing a fee. The Town argues the plain language of the statute imposes no such requirement. The question appears to be one of first impression, as neither the Enos nor the Town have provided any cases or legislative history shedding light on how to interpret

9

30-A M.R.S. § 3702. As explained below, the Court concludes Section 3702 does not require a municipality to estimate its costs prior to enacting a fee, but even if Section 3702 does so require, the Town satisfied the requirement in this case.

The Enos' interpretation of Section 3702 turns on the meaning of "reflect." According to the Enos, the word "reflect" means to "give back an image of; mirror or reproduce." Webster's New World College Dictionary, Fourth Ed. In order to reasonably "reflect" a municipality's costs, the Enos argue, the municipality must first know the costs. Thus, according to the Enos, Section 3702 imposes a temporal requirement on the Town to know costs before enacting a fee. The Enos' characterize what they view as Section 3702's temporal requirement as a form of good governance protection. They argue that unless a municipality is required to know its costs before enacting a fee, the municipality will be able to set a fee in any amount, and then adjust its expenses after-the-fact to reasonably reflect the fee, thereby rendering the statutory protection useless. (Pl. Br. 5.)

The Town counters Enos' argument by claiming they are asking the Court to "graft into [S]ection 3702 a requirement that simply does not exist." (Def.'s Br. 13.) The Town argues that the phrase "reasonably reflect" calls for a simple, objective comparison of the Fee to the Town's costs to see if they are in "basic harmony" with another. *Id.* It argues that adopting a subjective inquiry into what the Town knew, or did not know, at the time of the Fee's adaptation would be unworkable in practice and undesirable as policy. *Id.*

When interpreting a statute, a Court must interpret the statute to effectuate the legislative intent. *Wawenock, LLC v. DOT*, 2018 ME 83, ¶ 7, 187 A.3d 609. "The first and best indicator of legislative intent is the plain language of the statute itself." *Id.; see also Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 19, 107 A.3d 621 (the Court looks first to the plain language). If the statute

10

is unambiguous, the Court must interpret the statute according to its plain language, provided the result is not illogical or absurd. *Wawenock*, 2018 ME 83, ¶ 7.

In this case, the Court finds that the plain language of Section 3702 is unambiguous, and does not impose on municipalities the requirement to know the costs of program administration and enforcement before enacting a fee. If the legislature had wanted to impose such a requirement on towns and cities, it could easily have done so. *See Covanta Me., LLC v. PUC*, 2012 ME 74, ¶ 16, 44 A.3d 960 (had legislature wanted to impose a quantitative limit on expenditures, it could have done so); *E. Millinocket v. Medway*, 486 A.2d 739, 741-42 (Me. 1985) (if the Legislature had wanted to restrict tax exemptions it easily could have done so by adding restrictions to the appropriate section or to the definitional provisions). Here, the statute does not contain language requiring a town to conduct its cost analysis before establishing a fee, and such a significant legal burden cannot be read into the word "reflect."

As used in the statute, the word "reflect" is not anchored to any specific point in time. The reflection can occur before or after a municipality enacts a fee. In this sense, the word "reflect" is best understood to mean "mirror." The fee enacted by a municipality must reasonably mirror the costs associated with the program it pays for. If the costs are known in advance, the Town runs less chance of a challenge to the fee. If the costs are not known in advance, the Town runs a risk that a person subject to the fee will challenge the fee. In either instance, once challenged, the fee must be shown to approximate program costs. In either case, Section 3702 limits the ability of towns and cities to impose fees as a means of raising general revenue.

Here, there is no question that the Fee reasonably reflects the Town's cost of program administration and enforcement. The data compiled by the Town after it enacted the Fee conclusively settles the matter (and, but for the timing of the Town's analysis, is essentially

11

unchallenged by the Enos). Consequently, the Court determines the Fee does not violate 30-A M.R.S. § 3702.

Even if the Court is wrong, and Section 3702 required the Town to have estimated its costs before enacting the Fee, the outcome is no different. In this case, the Town *did* have an estimate of its costs before voting to increase the Fee. As a first step in conducting its due diligence, the Town consulted with Host Compliance. Host Compliance advised the Town that, based on national data, $250 is the average annual registration fee charged by vacation rental ordinances. Host Compliance provided the Town with a lengthy written report, which along with the average fee information, was used in the Town's analysis. The Town did not pull the annual $250 registration amount out of thin air. The Town relied on the national data supplied by Host Compliance to set a fee that reasonably reflected what the Town's program costs would be. Even if Section 3702 imposes a requirement on towns and cities to estimate costs in advance, Section 3702 does not specify the type, intensity, or nature of the analysis a municipality must use. In this case, the Town's reliance on the national data as a proxy for reflecting its own costs turned out to be right on the money.[8] As a result, under either interpretation, the Town complied with the requirements of 30-A M.R.S. § 3702.

### *The Fee Complies with 30-A M.R.S. § 4355*

In their brief, the Enos introduce the argument that the VRO is a land use ordinance under 30-A M.R.S. § 4301(8) ("[A]n ordinance or regulation of general application adopted by the municipal legislative body which controls, directs or delineates allowable uses of land and the standards for those uses."). (Pl.'s Br. 4-5.) If the VRO is a land use ordinance, as the Enos contend,

---

[8] Furthermore, the Enos' have not argued that the Town's demographics and vacation rental economy are unique, and therefore it was unreasonable for the Town to expect the national average fee would reasonably reflect program costs.

then 30-A M.R.S.A. § 4355 must also apply to any fee adopted as part of the VRO.[9] *Id.* Section 4355 reads: "Any application fee charged by a municipality for an application for any land use permit issued by the municipality *may not exceed the reasonable cost* of processing, review, regulation and supervision of the application by the municipality and its consultants and the administration of any requirement for a certificate of compliance with any permit conditions." (Emphasis supplied.) The Enos argue that Section 4355, like Section 3702, imposes a duty on the Town to determine the costs associated with a given fee and permit program *before* that fee is set. Because the Town did not make this determination before adopting the Fee, the Enos claim the Fee violates Section 4355.

The Court need not dwell for long on Section 4355. Assuming, without deciding, that 30-A M.R.S. § 4355 applies to the VRO, the result in this case is no different.[10] Nothing in the plain language of Section 4355 indicates a legislative intent to impose upon municipalities the requirement to conduct their analysis before adopting a fee. Even if Section 4355 could be so construed, the Town conducted a sufficient analysis before adopting the Fee to satisfy Section 4355. Moreover, the additional analysis conducted by the Town after adopting the Fee, establishes that the Fee does not exceed the reasonable cost of processing, review, regulation and supervision of the application by the municipality and its consultants and the administration of any requirement for a certificate of compliance with any permit conditions.[11] The Enos do not seriously challenge

---

[9] The Town asserts that the Court should not reach the Section 4355 argument, since the Enos did not raise Section 4355 in their Complaint. However, the Town had an opportunity to address Section 4355 in its brief and at oral argument. Further, as discussed below, the Section 4355 analysis does not change the outcome of the case. Thus, the Town is not prejudiced by the Court's consideration of 30-A M.R.S. § 4355.

[10] The Enos have not provided any cases or other material in support of their argument that the VRO is a land use ordinance as defined in 30-A M.R.S. § 4301(8). Given the Court's conclusion that the Town satisfied Section 4355, it is unnecessary to decide the applicability issue.

[11] Based on the cost analysis performed by the Town, it is possible that in some years program revenue may somewhat exceed costs, but the difference as insignificant and immaterial, and thus not a violation of 30-A M.R.S. § 4355.

13

this conclusion, instead focusing their attack on the timing of the analysis. Accordingly, the Court determines that the Fee does not violate 30-A M.R.S. § 4355.

## Constitutionality of the Fee

In addition to arguing that the Fee violates the fee setting provisions of Title 30-A, the Enos assert the Fee increase constitutes an unconstitutional tax in violation of Article IV, part 3, section 9 of the Maine Constitution. That provision states, in relevant part, that "all bills for raising a revenue shall originate in the House of Representatives."[12] When the constitutionality of a local ordinance is challenged, there is an initial presumption that the ordinance is constitutional. *Callaghan v. City of S. Portland*, 2013 ME 78, ¶ 50, 76 A.3d 348. The party challenging the ordinance has the burden of proof to demonstrate that the ordinance is unconstitutional or is being applied in an unconstitutional manner. *Id.* Taxes are primarily used to raise revenue, whereas fees are part of regulatory schemes and intended to cover costs of administering programs under government police powers. *Bd. Of Overseers of the Bar v. Lee*, 422 A.2d 998, 1004 (Me. 1980). Regulatory fees imposed by municipalities must be "limited and reasonably measured by the necessary or probable expenses of issuing the license and of such inspection, regulation and supervision as may be lawful and necessary," or else the fees run the risk of being found to constitute an illegal tax. *State v. Brown*, 135 Me. 36, 40, 188 A. 713, 715 (1936).

The Law Court has adopted a four-part test (the "*Butler* test") to determine if an assessment is a fee or a tax. *City of Lewiston v. Gladu*, 2012 ME 42, ¶ 9, 40 A.3d 964; *Butler v. Supreme*

---

[12] The Town argues that Article IV, part 3, section 9 of the Maine Constitution does not apply because it deals with the allocation of legislative powers between the House of Representatives and the Senate. It contends that Article IX, section 9 and article 1, section 22 may be more appropriate provisions of the Constitution upon which to rely for the Enos' argument. The Court concludes that the analysis is the same regardless of which provision of the Constitution is used to frame the argument. *See Butler v. Supreme Judicial Court*, 611 A.2d 987 (Me. 1997) (cites Article IV, part 3, section 9 to discuss constitutionality of fee); *Bd. Of Overseers of the Bar v. Lee*, 422 A.2d 998 (Me. 1980) (cites Article IX, section 9 and Article 1, section 22 when analyzing the constitutionality of the fee).

*Judicial Court*, 611 A.2d 987, 990 (Me. 1992).  When making the distinction between a fee and a tax, a court must consider "(1) whether the primary purpose (of the assessment) is to raise revenue; (2) whether the assessment is paid in exchange for exclusive benefits not received by the general public; (3) whether the assessment is voluntary; and (4) whether the assessment is a fair approximation of the cost to the government and the benefit to the individual of the services provided." *Gladu,* 2012 ME 42, ¶ 9 (internal quotations omitted); *State v. Biddeford Internet Corp*., 2017 ME 204, ¶ 20, 171 A.3d 603.  In this case, the Enos concede parts two (fee paid in exchange for benefits) and three (payment is voluntary) weigh in favor of the Town, and thus focus their challenge on parts one (purpose of the fee) and four (fee is a fair approximation of costs).  In light of the Enos' concessions, which the Court accepts for purposes of establishing that parts two and three are satisfied, the Court limits its analysis to parts one and four of the *Butler* test.

### *Part 1: Purpose*

The Enos contend that the Fee was passed not to further the regulatory purpose of the VRO, but rather to raise revenue, lower the tax burden, and fund future projects. (Pl.'s Br. 10.).  In support of their argument, the Enos urge the Court to consider the comments made by individual Council members.  The comments, however, do not advance the Enos' cause.  First, even if one analogizes Council members to legislators—an analogy which is dubious since Town voters actually approve the budget, not Council members—individual comments of legislators are generally not very probative as legislative history.  Robert C. Farrell, *Legislative Purpose and Equal Protection's Rationality Review*, 37 Vill. L. Rev. 1, 29-31 (1992) (since floor comments represent individual legislators' motivation, they are often contradictory, selective, and constitute an incomplete picture of legislative intent); *see also Allen v. Attorney Gen. of State of Me.*, 80 F.3d 569, 575 (1st Cir. 1996) ("courts must be chary of overevaluating isolated comments by individual solons").  Second,

the individual comments of Council members in this case show a fair degree of diversity, not consensus, about whether and to what extent the Fee would generate excess revenue. Third, the substantial weight of other evidence in this case establishes that the primary purpose of the Fee is to support the VRO, not raise revenue.

Knight started the discussion which ultimately led to increasing the Fee, by asking Chamberlain to investigate strategies for addressing the problems related to vacation rentals in Bar Harbor. Knight did not say anything about raising the Fee. Chamberlain contacted Host Compliance, as requested by Knight, and along with a great deal of other information, learned that the national average for registration fees was $250, and that most municipalities required annual registration. Knight provided a summary of all this information to the Town Council, which considered the information in the context of discussing changes to the VRO. The Fee was never considered separate from the VRO as a revenue generating mechanism; instead, the Fee increase was always discussed in the context of the VRO. Using funds generated from the Fee increase, the Town hired an assistant CEO and contracted with AirDNA to help them keep track of vacation rentals in Bar Harbor.

Based on these facts, it is clear that the Fee was set and implemented with the primary purpose of supporting VRO administration and enforcement. The evidence establishes that revenue from the Fee is actually going towards VRO administrative and enforcement costs, as it should. Further, even if the Fee were to generate excess revenue, those excess funds could be put to use for related regulatory purposes without altering the Fee's primary purpose. *Gladu*, 2012 ME 42, ¶ 16, 40 A.3d 964 (permissible to use excess revenue from a fee intended to regulate storm water runoff to pay debt incurred in maintaining the regulatory infrastructure); *Biddeford Internet*

16

*Corp.*, 2017 ME 204, ¶ 21, 171 A.3d 603. In light of the above, the Court determines that the Fee's primary purpose is to support the VRO, not raise general revenue.

### Part 4: Fair Approximation

Citing *Gladu*, the Enos claim that in order for a fee to be a fair approximation of the costs to the government, the fee must be based upon an approximation known at the time the fee is set. *Gladu*, 2012 ME 42, ¶ 25, 40 A.3d 964. This is essentially a reprise of their argument under Title 30-A. The Court does not read the "fair approximation" prong of the *Butler* test to have embedded within it a temporal component. It need only be shown, at the time the fee is challenged, that the subject fee is a fair approximation of the cost to the government and the benefit to the individual of the services provided.[13] *See Butler*, 611 A.2d at 990. The evidence establishes that the Fee in this case meets the fair approximation prong. The anticipated program revenue of $120,000 fairly approximates program costs that range from $82,712 to $142,700, and owners of vacation rentals receive all the benefits of a well-run and adequately funded VRO program that draws upon Town-wide services.

However, even if the "fair approximation" part of the *Butler* test does contain a temporal element, the Fee still passes muster. The Court finds the Fee here was based upon a fair approximation of costs known at the time the fee was adopted, because the Town based the Fee on the national average. The Enos have not argued that the Town is unique, an outlier, or has extraordinary features that would render the national average Fee insufficient as a fair approximation of the Town's regulatory costs. Hence the Fee increase does not constitute an illegal tax under the Maine Constitution, because the primary purpose of the Fee is regulatory, and the Fee represents a fair approximation of program costs and benefits.

---

[13] The Enos have not argued the Fee is unfair in relation to the benefits to the individual.

## CONCLUSION

For the reasons discussed above, the Court enters final judgment in favor of Defendant, Town of Bar Harbor, on both remaining counts of the Complaint.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Judgment by reference on the docket for this case.

So Ordered.

November 4, 2020

_____/s_____

Michael A. Duddy
Judge, Business and Consumer Docket

**JONATHAN ENO and**
**KAREN GLIFILLAN-ENO**

**v.**

**TOWN OF BAR HARBOR**

Plaintiff Counsel:          Kate Grossman, Esq.
                            *Farrell Rosenblatt & Russell*
                            PO Box 738
                            Bangor, Me 04401-0738


Defendant Counsel:          Joshua Randlett, Esq.
                            Jonathan Hunter, Esq.
                            *Rudman & Winchell*
                            PO Box 1401
                            84 Harlow Street
                            Bangor, ME 04402-1401